FRANK FRANTZ, W. H. MURRAY, JOHN M. YOUNG, C. I. OVERSTREET, C. H. CHOWNING, C. M. DELZELL, M. R. MANSFIELD, CHARLES BOWMAN, J. C. MAJOR, I. J. CORWIN, AND CHARLES B. POWELL v. G. E. AUTRY

(Filed June 25, 1907.)

1. **CONSTITUTION—Defined.** A consitution is the written instrument by which the fundamental powers of the government are established, limited, and defined, and by which those powers are distributed among the several departments for their safe and useful exercise for the benefit of the body politic.

2. **CONSTITUTIONAL CONVENTION—Powers of.** The constitutional convention is vested with the powers, and charged with the duty and responsibility of forming a constitution and state government; and in the performance of such duties it exercises legislative powers and functions.

3. **SAME—Same—Limitations.** The convention has, and can exercise plenary powers, subject to the limitations and restrictions that the constitution shall be republican in form, that it shall not be repugnant to the constitution of the United States and the principles of the Declaration of Independence, that no distinction shall be made on account of race or color, and that the convention shall by ordinance irrevocable accept all the terms and conditions in the enabling act.

4. **SAME—Same—Powers to Form Counties.** The power vested in the convention to form a state government clearly implies the power to create and define all the counties within the limits of the proposed state, the only limitation upon the convention in this respect being that the Osage Indian Reservation shall remain a separate county until the lands therein are allotted in severalty, and until changed by the legislature of the state.

5. **COUNTY—Defined.** A county is one of the territorial divisions of the state created for public and political purposes connected with the administration of the state government.

6. **OFFICERS—Defined under Terms of Enabling Act.** Officers for a full state government, under the terms of the enabling act, in-

clude not only state officers whose powers and duties are co-extensive with the limits of the state, but include all the officers provided for in the constitution, from the highest to the lowest, whose duties are in any manner connected with the administration of the state government.

7. **CONSTITUTIONAL CONVENTION—Power of—Elections..** Congress by the express terms of the enabling act, conferred the power and authority upon the convention to pass appropriate ordinances for submitting the constitution to the people for ratification or rejection at an election to be held at a time fixed in said ordinance.

8. **ORDINANCE—Defined.** An ordinance, as used in this act, means a law which is essential to carrying into effect merely the objects for which the convention was created. Such an ordinance, when once adopted by the convention, has the force and effect of law.

9. **COURT OF EQUITY—Powers of—Jurisdiction as regards Constitutional Convention.** A court of equity has no power or jurisdiction to restrain or enjoin the constitutional convention, its officers or delegates from exercising any of the rights, powers, and obligations confided to it by congress or the people; nor can the powers of the court be invoked to restrain or enjoin the submission of the constitution or any proposition contained therein to a vote or the people in advance of its adoption and ratification by the people and its approval by the President of the United States, on the ground that the proposed constitution or any of its provisions is unconstitutional, or that the convention acted in excess of its lawful powers.

10. **CONSTITUTIONAL LAW—Power of Congress—Delegated to President.** The constitution of the United States guarantees to every state a republican form of government and power to determine whether the constitution is republican in form is primarily a legislative power, and resides in congress; but this power was delegated by congress to the President of the United States, and such question is not subject to judicial cognizance.

(Syllabus by the Court.)

*Error from the District Court of Woods County; before John L. Pancoast, Trial Judge.*

W. A. *Ledbetter, Dale & Bierer* and J. F. *King,* for plaintiffs in error.

W. W. S. *Snoddy,* and H. A. *Noah,* for defendant in error;

*Horace Speed,* of counsel.

## STATEMENT OF FACTS.

On June 16, 1906, the congress of the United States passed an act entitled "An Act to Enable the People of Oklahoma and of the Indian Territory to Form a Constitution and State Government and be Admitted into the Union on an equal footing with the Original States," U. S. Stats. L. 59th Congress, chap. 3335.

Under and in conformity with the provisions of this act, members of the constitutional convention were elected, and the convention was duly organized, W. H. Murray being elected its president and John M. Young its secretary.

Thereupon the convention proceeded to the forming of a constitution and state government, and an ordinance for the submission of the same to the qualified voters of the proposed state of Oklahoma for ratification or rejection, August 6, 1907, being the date fixed by said ordinance for the holding of such election, which ordinance also provided for the election of all state, district, county, and township officers, including the members of the legislature and five representatives to congress.

It was also provided that within twenty days after the adoption of such constitution and ordinance by the constitutional convention, which was done on April 22, 1907, the governor of Oklahoma should issue a proclamation calling an election for the sixth day of August, 1907, in the manner prescribed by said ordinance; and that if the governor should fail or neglect to call such election, then the president of the constitutional convention was authorized to issue such proclamation.

Woods and Woodward counties are organized and existing counties of the Territory of Oklahoma, and have been such since the opening of the Cherokee Outlet to settlement in 1893, each of said counties having a full complement of county, township, and city officers. It is proposed by the constitutional convention by one of the provisions of the constitution, to divide the territory which has heretofore composed Woods county into three parts, a portion of the eastern part of said county being designated and established as Alfalfa county, a portion of the southern part as Major county, and the remainder of said county of Woods, together with several congressional townships taken from Woodward county, is designated as Woods county. This action of the convention provides for the establishment of two entirely new counties, to wit, Alfalfa and Major, which do not, at the present time, exist as counties in the Territory of Oklahoma.

By the terms and provisions of the election ordinance, three persons are named and appointed as county commissioners, and one person as county clerk, for each of said Alfalfa and Major counties. The counties are divided into municipal townships and commissioners' districts, to conform to such divisions in the other counties of Oklahoma, and it is further provided in said ordinance that:

"Said county commissioners shall on or before the 8th day of June, A. D. 1907, divide or designate the townships of their respective counties into election precincts and establish the boundaries of the same, and shall designate a polling place in each precinct, and appoint all necessary inspectors of election in the several precincts, whose duties shall be the same as inspectors of election under the laws of the

Territory of Oklahoma, and shall also perform all other duties required to be done or performed by the boards of county commissioners pertaining to elections under the laws of the Territory of Oklahoma for elections therein, and shall perform all other duties or acts necessary to the conduct of said elections."

This action was commenced in the district court of Woods county by G. E. Autry, a taxpayer and member of the board of county commissioners of said county, against Frank Frantz, governor of Oklahoma, and W. H. Murray, president of the constitutional convention, John M. Young, secretary thereof, and the other defendants as the said designated county commissioners and county clerks of the counties of Alfalfa and Major, to enjoin the said Frank Frantz, W. H. Murray, and John M. Young from issuing or publishing any proclamation in which said proclamation it is proposed to submit to the electors of the proposed state of Oklahoma, either as a part of the proposed constitution or as a separate ordinance, any clause or provision dividing or purporting to divide Woods county, or changing or in anywise interfering with any township or precinct therein, and to enjoin and restrain the said C. I. Overstreet, C. H. Chowning, C. M. Delzell, M. R. Mansfield, Charles Bowman, J. C. Major, I. J. Corwin and Charles B. Powell from in anywise interfering with or usurping or attempting to usurp any of the duties of the county commissioners or county clerk, or any or either of them, of the county of Woods, in or about the said proposed election or any of the preparations therefor, at or in any part of the territory of the county of Woods as now described and existing, and from in anywise

acting or attempting to act in any capacity or to any extent in any election to be held in the said pretended counties of Alfalfa and Major, or either of them.

In the absence of the district judge from the county, application was presented to the probate judge of Woods county, and a temporary order of injunction was granted as prayed for in the plaintiff's petition.

Defendants in the court below, appellants here, interposed a demurrer to the petition, for and upon the grounds that the plaintiff had no legal capacity to sue; that the court had no jurisdiction of the subject-matter of the action; and that the petition did not state facts sufficient to constitute a cause of action. At the same time a motion to dissolve the temporary injunction was filed, for the reasons and upon the grounds above stated, and in addition thereto alleging that the defendants and each of them are only attempting to perform those acts and duties legally imposed upon them by the ordinance of the constitutional convention, and that the convention organized under the laws of congress has legal power and authority to provide by ordinance for the performance of the duties which are imposed upon them.

Upon the presentation and hearing of the demurrer and the motion to dissolve the temporary injunction, the court overruled the same, and held: That the plaintiff had the legal capacity, as a citizen and taxpayer, to maintain this action; that the constitutional convention had no powers conferred upon it, except such powers as are expressly conferred upon it by the enabling act, and such powers as are incidentally necessary to carry into effect the objects and pur-

poses of such act; and denied the power of the convention to divide Woods county, and create new counties thereof, and held that the convention in that respect, acted beyond its express or implied powers; and further held that the convention had no power to provide for the election of county or township officers at the time the constitution is submitted to the voters of the proposed state of Oklahoma for their ratification or rejection.

The defendants thereupon filed a general denial, and the cause was submitted to the court on an agreed statement of facts practically as above stated, and the court thereupon rendered the following final judgment in said cause:

"Now on this 8th day of May, 1907, the parties to the above-entitled cause appeared in open court, by their respective attorneys, and said cause was presented to the court upon the motion of the defendants to dissolve, vacate and set aside the temporary injunction herein, and upon the demurrer to the plaintiff's petition.

"Said cause was duly argued and fully presented and by the court taken under advisement until the 13th day of May, 1907.

"Thereupon, on the 13th day of May, 1907, the parties all appeared by their respective counsel as heretofore, and the court, being duly advised in the premises, finds that the said motion to dissolve the temporary injunction should be overruled, and also that the demurrers presented to the plaintiff's petition should each be overruled; to each and all of which rulings the defendants and each of them duly excepted.

"Thereupon, by leave of court, the defendants filed their answer herein and the plaintiff filed and presented his motion to strike out the second paragraph of said answer, which

motion being duly presented, was by the court overruled; to which the plaintiff excepted.

"Thereupon said cause was duly presented and submitted to the court for final determination and judgment upon the agreed statement of facts and the evidence offered, and upon such submission the court, after due consideration, finds all of the issues in favor of the plaintiff and against the defendants and each of them; to which the defendants and each of them duly excepted.

"It is, therefore, by the court considered, ordered and adjudged that the demurrers of the defendants and each of them separately be, and the same are hereby overruled; to which the defendants and each of them duly except.

"It is further considered, ordered and adjudged by the court that the motions of the defendants and each of them separately, to vacate and set aside the temporary injunction heretofore granted be, and the same is by the court hereby overruled; to which the defendants and each of them separately duly except.

"It is further by the court considered, ordered and adjudged that the temporary injunction heretofore granted herein be and the same is hereby made perpetual, and that the defendants Frank Frantz, W. H. Murray and John M. Young, be and they are hereby enjoined and restrained from issuing or publishing any proclamation in or by which said proclamation it is proposed to submit to the electors of the proposed state of Oklahoma, either as a part of the proposed constitution for said state of Oklahoma or as a separate ordinance, any clause, provision or proposition dividing or pretending to divide Woods county, in said Territory of Oklahoma, or changing or pretending to change the lines and boundaries of said county, or making or purporting or pretending to make or describe or bound any new county or counties out of any part of the present territory of the said Woods county. or changing or in anywise interfering

with the said county or the lines thereof or any townships or precincts therein, or any or either of the lines of the said townships or precincts; and enjoining and restraining the said C. I. Overstreet, C. H.. Chowning, C. M. Delzell, M. R. Mansfield, Charles Bowman, J. C. Major, I. J. Corwin and Charles B. Powell from in anywise interfering with any of the duties of the county commissioners or county clerk, or any or either thereof, of the said county of Woods, in or about the election proposed to be held in said county on the sixth day of August, 1907, and from in anywise interfering with the duties of the said county commissioners or county clerk of said county of Woods, as the same is now described and exists, in any of the preparations of any kind or character for said election, and enjoining and restraining them from acting or attempting to act in any capacity or to any extent in any election to be held in the pretended counties of Alfalfa or Major, or .either thereof, and that the defendants pay the costs herein, taxed at ————dollars; to all and each part of which the defendants and each of them duly except.

"Thereupon the defendants and each of them separately present their motion for a new trial of said cause; which motion is by the court, after due consideration overruled; to which the defendants and each of them duly except.

"Thereupon. on application of the defendants and each of them, for good cause shown, the court extends the time for making and serving case made herein, and the defendants are given ten days from this date in which to make and serve case made for the supreme court, and the plaintiff is given three days after service of said case made in which to suggest amendments thereto, said case made to be settled on two days' notice in writing."

Upon the record defendants bring the case to this court for review of the said judgment.

Frantz *et al.* v. Autry.

A certified copy of the election ordinance, as incorporated in the record, is hereby made a part of this statement of facts, and is as follows, to wit:

### "ELECTION ORDINANCE

"An Ordinance providing for an election at which the proposed constitution for the proposed state of Oklahoma shall be submitted to the people thereof for ratification or rejection, and submitting separately to the people of the proposed state of Oklahoma the proposed prohibition article making substantially the terms of the enabling act uniformly applicable to the entire state for ratification or rejection, and for the election of certain state, district, county and township officers provided for by said proposed constitution, and for the election of members of the legislature of said proposed state of Oklahoma, and five representatives to congress.

"BE IT ORDAINED, By the convention assembled to form a constitution and state government for the proposed state of Oklahoma:

"Section 1, That in compliance with an act of the congress of the United States of America, entitled, 'An act to enable the People of Oklahoma and of the Indian Territory to form a Constitution and State Government and be admitted into the Union on an equal footing with the Original States; and to enable the people of New Mexico and of Arizona to form a Constitution and State govenment and be admitted into the Union on an equal footing with the Original States:' approved June 16, 1906, hereinafter mentioned and referred to as the enabling act, and by virtue thereof, an election is hereby called and shall be held on the sixth day of August, in the year of our Lord, one thousand nine hundred and seven in all the voting precincts at said time, in the proposed state of Oklahoma, for the purpose of submitting to the people thereof the question of the ratification or rejection of the constitution framed and adopted by this conven-

tion for said proposed state of Oklahoma, and for the adoption or rejection of all questions therewith separately submitted, and at which election the qualified voters of said proposed state shall vote directly for or against the proposed constitution, and for or against any provisions separately submitted. Said election shall, in all respects, be held and conducted in the manner required by the laws of the Territory of Oklahoma for election therein, when not in conflict with the enabling act, and as supplemented by this ordinance, and the returns of said election shall be made to the secretary of the Territory of Oklahoma. who, with the chief justice thereof, and the senior judge of the United States court of appeals for the Indian Territory, shall canvass the same, and if the majority of the legal votes cast on that question shall be for the constitution, the governor of Oklahoma Territory and the judge senior in service of the United States court of appeals for the Indian Territory shall certify the results to the President of the United States, together with the statement of the votes cast thereon, and upon separate articles or propositions, and a copy of said constitution articles, propositions and ordinances, and in all respects comply with the provisions of said enabling act.

"Sec. 2. On the same day of the election for the ratification or rejection of said constitution, there shall be held by the qualified voters for the proposed state, in accordonce with the election laws of the Territory of Oklahoma when not in conflict with the enabling act and as supplemented by this ordinance, an election for officers for a full state government, including all the elective state, district, county and township officers, provided for by the provisions of said constitution, members of the legislature and five representatives to congress, and an election is hereby called for said day and for such purposes. The ballots used in voting for said officers shall be prepared. printed, furnished and distributed as required by the laws of the Territory of Oklahoma for elections therein.

The returns of said election shall be made as in this ordinance provided.

"In the counties of Beaver, Blaine, Caddo, Canadian, Cleveland, Custer, Comanche, Dewey, Garfield, Grant, Greer, Kay, Kingfisher, Kiowa, Lincoln, Logan, Noble, Oklahoma, Pawnee, Payne, Pottawatomie, Roger Mills, Washita, Woods, and Woodward, as defined and described in said constitution, said elections shall be held and conducted by the local authorities in their respective counties and voting precincts, in the same manner as now required by the laws of the Territory of Oklahoma for elections therein.

"In the counties of Beaver, Caddo, Comanche, Greer, Payne, Roger Mills and Woodward the local authorities in said respective counties, and the voting precincts therein, shall exercise their functions and perform their duties as such election officers only within the limits of said counties as defined and described in the constitution.

"In the county of Noble, the local authorities, in the exercise of their functions and the performance of their duties as election officers, shall exercise and extend the same to the limits of said county as defined by the constitution.

"Sec. 3. In the counties of Adair, Alfalfa, Atoka, Beckham, Bryan, Carter, Cherokee, Choctaw, Cimmarron, Coal, Craig, Creek, Delaware, Ellis, Garver, Grady, Harper, Hughes, Haskell, Jackson, Jefferson, Johnston, Latimer, LeFlore, Love, Major, Murray, Muskogee, Mayes, Marshall, McClain, McCurtain, McIntosh, Nowata, Okfuskee, Okmulgee, Osage, Ottawa, Pittsburg, Pontotoc, Pushmataha, Rogers, Seminole, Sequoyah, Stephens, Texas, Tillman, Tulsa, Wagoner, and Washington, the local officers and authorities provided for in this ordinance, shall exercise all the functions and perform all the duties within the limits of such counties, townships and voting precincts in the same manner as is now required by the laws of the Territory of Oklahoma for elections therein.

"Sec. 4. That the counties hereinafter named be and they are hereby divided into the following described and numbered commissioners' districts and the following described and numbered or named municipal townships:

"Sec. 5. Any board of county commissioners or a majority of such board, shall have the power at any time prior to the first day of June, Anno Domini, nineteen hundred and seven, to change the boundaries of any municipal township or commissioners district, fixed by the ordinance, and it is especially provided that the boundaries of such township and commissioner's district, after August 6th, nineteen hundred and seven, may be changed in the manner as provided by the laws of the Territory of Oklahoma for the changing of such boundaries: Provided, such changes of boundary lines as to municipal townships and commissioner's districts, if made prior to June 1st, A. D. nineteen hundred and seven, (and no change as to boundaries whatever shall be make during the time intervening between the first day of June, A. D. nineteen hundred and seven and the sixth day of August, A. D. nineteen hundred and seven) shall not operate to change any polling places or to destroy any voting precinct.

"Sec. 6. In each of the counties of Greer, Beaver, Woods, Woodward, and Comanche, (And any other county in the proposed state similarly situated) as defined and described in this constitution, on or before the sixth day of June, A. D. nineteen hundred and seven, the acting board of county commissioners therein or a majority thereof, shall subdivide such county or counties into commissioners districts and townships, and fix election precincts, designate polling places, necessary for the purpose of the election herein provided for. And should such commissioners fail to comply with the provisions of this section by said date, Wm. H. Murray, as president of this convention, shall within five days thereafter, appoint three qualified electors in each of

such counties not more than two of whom shall belong to any one political party, to divide such county or counties into commissioners districts and townships, and fix election precincts, and designate polling places for such purpose.

"Sec. 7. Said county commissioners shall on or before the eighth day of June, A. D. nineteen hundred and seven, divide or designate the townships of their respective counties into election precincts and establish the boundaries of the same, and shall designate a polling place in each precinct, and appoint all necessary inspectors of election in the several precincts, whose duties shall be the same as inspectors of election under the laws of the Territory of Oklahoma, and shall also perform all other duties required to be done or performed by the boards of county commissioners pertaining to elections under the laws of the Territory of Oklahoma for elections therein, and shall perform all the duties or acts necessary to the conduct of said board.

"Sec. 8. That the election laws of the Territory of Oklahoma now in force, as far as applicable and not in conflict with the enabling act, including the penal laws of said territory relating to election and illegal voting, are hereby extended and put in force throughout the proposed state of Oklahoma until the legislature of said proposed state shall otherwise provide, and until all persons offending against said laws in the elections aforesaid, shall have been dealt with in the manner therein provided, and the courts of said state shall have power to enforce said laws in the same manner as other criminal laws of said state.

"Sec. 9. On the Friday following the election provided for in this ordinance, the county clerk and the commissioners of each county of said proposed state, or a majority of said commissioners, shall meet at the office of said clerk at ten o'clock A. M. of said day, and shall proceed to canvass the several returns which have been made to that office and determine the persons who have received the greatest number

of votes in the county or the several county, township, district and state officers, members of the legislature and representatives to congress, and such findings shall be reduced to writing and signed by said commissioners and attested by the clerk and shall be annexed to the abstract given for such officers. If any two or more persons have an equal number of votes for the same office and a higher number than any other person, the commissioners aforesaid shall proceed to determine by lot which of the two candidates shall be elected. As soon as the commissioners have determined the person who has received the highest number of votes for any office, the county clerk shall make out abstracts of the votes in the following manner: First, the abstract of the votes for state and district officers and members of the legislature on one sheet; Second, the abstract of votes for representative to congress, on one sheet; and third, the abstract of votes for county and township officers on one sheet; and fourth an abstract of the votes cast for or against the proposed constitution and for or against articles separately submitted, which abstracts being certified and signed by the county clerk shall be deposited in his office and certified copies of abstracts for state and district officers, members of the legislature and representatives to congress, shall be placed in separate envelopes, endorsed and directed to the secretary of the Territory of Oklahoma and forwarded immediately by mail. The failure of the clerk to affix his seal to any such certificate shall not invalidate the returns. And said commissioners of each county in said proposed state or a majority thereof shall, at said time and place, also proceed to canvass the returns which have been made to the office of the county clerk of the election held to ratify or reject the constitution or any provision separately submitted, and reduce the result of said canvass to writting, which shall be signed by the said commissioners and attested by the clerk, and the clerk shall make an abstract of the votes cast for or

against the ratification of the said proposed constitution, on one sheet and for or against any provision separately submitted, on one sheet which abstract being signed and certified by the county clerk shall be deposited in his office and certified copies thereof, under his official seal, shall be placed in a separate envelope, endorsed and directed to the secretary of Oklahoma, and forwarded immediately by mail.

"The said county clerk shall immediately make out in pursuance of the determination of the said county commissioners, a certificate of election for any person receiving the highest number of votes for any office or in case of a tie who have been decided by lot, to have been elected and deliver the same to the person entitled thereto upon his making application therefor.

"The Governor of the Territory of Oklahoma, the secretary, the auditor, treasurer and attorney general of said territory, or any three of them shall constitute the state canvassing board for the proposed state of Oklahoma. The secretary of the Territory of Oklahoma upon the receipt of the certified abstracts of the votes given in the several counties, directed to be sent to him, shall proceed to open the same and shall record the same in a suitable book to be kept for that purpose, and shall file and carefully preserve them in his office together with the original envelopes in which they were enclosed. If from any county no such abstract of votes shall have been received within ten days after the election aforesaid by the secretary of the Territory of Oklahoma, he shall dispatch a special messenger to obtain a copy of same from the county clerk of such county, and such clerk shall immediately on demand of said messenger make out and deliver to him the copy required, which copy of the abstract of votes aforesaid, the messenger shall deliver to the secretary of the Territory of Oklahoma without delay; the expense of said messenger to be paid by the county clerk failing to make such return.

"For the purpose of canvassing the result of the election the state board of canvassers for the proposed state of Oklahoma shall meet at the office of the secretary of the Territory of Oklahoma, within thirty days after said election, where they shall open the certified abstracts on file in the office of the secretary of the Territory of Oklahoma and proceed to examine and make statements of the whole number of votes given or cast at said election for state and district officers and members of the legislature and representatives to Congress which statement shall show the names of the persons to whom such votes shall have been given for each of the said officers and the whole number given to each distinguishing the several districts and counties in which they are given. They shall certify said statements to be correct and shall subscribe their names thereto and shall determine what persons shall have been by the greatest number of votes duly elected to such offices, and shall endorse and subscribe on each statement a certificate of election and determination and deliver the same to the secretary of the Territory of Oklahoma.

"If any two or more persons have an equal number of votes for members of the legislature or representatives to congress or for any state or district office the said canvassing board shall proceed to determine by lot, in the presence of the candidates, which of the two candidates shall be elected. Reasonable notice shall be given to said candidate of the time when such elections shall be determined, and if such candidates, or either of them, fail to appear, in accordance with such notice, then the board of canvassers shall proceed to determine such election in the absence of the candidates.

"The secretary of the Territory of Oklahoma shall record in his office in a book to be kept by him for that purpose. each certified statement of determination as made by such board of canvassers, and shall without delay make out and transmit to each of the persons thereby declared to be

elected, a certificate of his election certified by him under his seal of office, and he shall also forthwith cause a copy of such certified statement of determination to be published in a newspaper published at the capital.

"Sec. 10. The secretary and the chief justice of the Territory of Oklahoma, and the senior judge of the United State court of appeals for the Indian Territory shall within thirty days after the election herein provided for, canvass the returns of said election to ratify or reject the constitution or any provision separately submitted.

"Sec. 11. The canvass and returns of said election for the ratification or rejection of the constitution, and propositions submitted, and for all officers authorized by the constitution, except as otherwise provided in the enabling act and the supplementary provisions of this ordinance shall be made in accordance with the election laws of the Territory of Oklahoma.

"Sec. 12. Whenever a vacancy occurs in the office of county commissioner provided for by this ordinance such vacancy shall be filled by appointment by the governor of the Territory of Oklahoma within three days from the date that he is notified of such vacancy, such notice is to be given by the county clerk, and where the governor fails to fill such vacancy within said time, said vacancy shall be filled by appointment by Wm. H. Murray as president of the constitutional convention: Provided, however, that if the vacancy is caused by death or resignation, the person appointed to fill the vacancy shall be appointed from the same political party to which such officer belonged, and he shall serve as if he had been originally named by this ordinance.

"Sec. 13. Wherever a vacancy occurs in the office of county clerk, provided for in this ordinance, such vacancy shall be filled by appointment by the board of county commissioners, and where such board of commissioners fail or refuse for three days, to fill such vacancy, the same shall

be filled by appointment by Wm. H. Murray as president of the constitutional convention: Provided, however, if the vacancy is cause by death or resignation, the person appointed to fill the vacancy shall be appointed from the same political party to which such officer belonged, and he shall serve as if he had been originally named by this ordinance.

"Sec. 14. All officers appointed and provided for in this ordinance shall, before entering upon the discharge of their duties, take an oath or affirmation to support the constitution and the laws of the United States, the terms of the enabling act, and of this ordinance, and to well· and faithfully discharge the duties of their respective offices, and all inspectors, judges and clerks of said election shall take an oath or affirmation in conformity with and as required by the election laws of the Territory of Oklahoma.

"Sec. 15. The governor of the Territory of Oklahoma and two qualified electors by him appointed one from each. of the two political parties that cast the largest number of˙ votes in said proposed state in the election of delegates to the constitutional convention, shall constitute a board of election commissioners for the purpose of the election herein provided for. Such appointments shall be made at least thirty days previous to said elections, and if prior to that time the chairman of the central committee of the proposed state, of either of such parties, shall nominate in writing a member of his own party for said appointment, the Governor of the territory shall appoint such nominee. In case of the death, disability or refusal to serve of either appointee, the governor of the territory shall notify the chairman of the central committee of such appointee's political party, and such chairman may, within three days thereafter, recommend a successor, who shall thereupon be appointed: Provided, that if such chairman shall fail to make recommendations of appointment within the time specified, the

governor of the Territory of Oklahoma shall make such appointments of his own selection from such political party.

"It shall be the duty of said board to prepare and distribute the ballots, stamps and election supplies for the election of all officers for whom the qualified electors of the proposed state are entitled to vote, for representatives to congress, and all members of the legislature, and all officers provided by the constitution for whom the voters of more than one county are entitled to vote, in compliance with the provisions of said constitution and of the election laws of the Territory of Oklahoma. Said board shall also prepare and distribute ballots, stamps and election supplies for the election for the ratification or rejection of the proposed constitution and for or against any provisions separately submitted. The said board shall perform and exercise such other duties as may be prescribed by the election laws of the Territory of Oklahoma and by this ordinance.

, "In event that the governor of the Territory of Oklahoma shall fail or refuse to act or perform the duties aforesaid, such duties shall be exercised and performed by Wm. H. Murray as president of the convention.

"Sec. 16. In each county in the proposed state, the county clerk and two persons by him appointed, one from each of the two political parties that cast the largest number of votes in said proposed state at the election of delegates to the constitutional convention, shall constitute the county board of election commissioners. Said appointments shall be made in all respects as the appointments for the board of election commissioners hereinbefore provided for or required to be made by the governor of the Territory of Oklahoma, except that the privilege of nomination shall belong to the chairman of the county central committee of the two parties aforesaid.

"It shall be the duty of such board.to prepare and distribute the ballots and election supplies for all officers to

be voted for in such counties or who are to be voted for other than those who are to be voted for by all the electors of the proposed state, and members of the legislature and district officers as hereinbefore provided in compliance with the provisions of this ordinance, and said board shall perform such other duties as provided for by the election laws of the Territory of Oklahoma, and by this ordinance.

"In the event any county clerk shall fail or refuse to perform or discharge any of the duties aforesaid, or be disqualified, the county commissioners shall appoint some one to act as county clerk in the performance of such duties.

"Sec. 17. In the event any of the county commissioners in any county of the proposed state shall fail or refuse or be disqualified to perform any of the duties required by this ordinance or the election laws of the Territory of Oklahoma the governor of the territory shall appoint some one in his stead: Provided, that such appointment shall be made form the same political party as that to which such commissioner belonged.

"In the event the governor of the Territory of Oklahoma shall fail or refuse to make due action thereon, and to make such appointment within three days after he shall be notified of such failure or refusal or disqualification or disability, on the part of such commissioner, such appointment shall be made by Wm. H. Murray as president of this convention.

"Sec. 18. Nominations for all state, district, county and township offices may be made as provided for under the primary election laws of the Territory of Oklahoma, and said election laws, in connection with election laws of the Territory of Oklahoma, be and are as aforesaid hereby put in force and effect throughout the proposed state of Oklahoma: Provided, that in cities and towns of the Indian Territory and the Osage Indian Reservation having a population of twenty-five hundred inhabitants or more as shown

by any official census taken either under the auspices of the United States government or such municipal corporations, the qualified electors therein shall register up to the 18th day of May, A. D., 1907, in order to be entitled to vote therein at any primary election held on or after the 23rd day of May, A. D. 1907, and prior to August sixth A. D. 1907, And Provided Further, that any person having registered at the election of delegates to the constitutional convention, or any municipal election during 1907, shall not be required to further register in order to vote at such primary election or elections; And Provided Further, that any person who shall be prevented from registering by reason of sickness or necessary absence from such city or town, which fact may be shown as provided by the laws of Oklahoma Territory, or shall be prevented by the clerk or recorder of such city or town failing or refusing to register then such elector shall be allowed to vote at such election.

"Sec. 19. The submission of the proposed constitution for the proposed state of Oklahoma, and the separate provision, to the people of said proposed state, for ratification or rejection, shall be upon the same ballot in the following form:

"SHALL THE CONSTITUTION FOR THE PROPOSED STATE OF OKLAHOMA BE RATIFIED?
"☐  YES.
"☐  NO.

"SHALL THE PROVISION FOR STATE-WIDE PROHIBITION BE ADOPTED?
"☐  YES.
"☐  NO.

"And ballots used in voting for or against the proposed constitution, and for or against any provisions separately submitted shall contain no other matters to be voted on at

such election and shall be prepared, printed, furnished and distributed by the board of election commissioners for the proposed state as required by the laws of the Territory of Oklahoma for elections therein, not in conflict with the provisions of the enabling act and as supplemented by this ordinance and shall when voted be deposited in ballot boxes separate from any others used at said election. Said election shall in all respects be held and conducted in the manner required by the laws of the Territory of Oklahoma for elections therein when not in conflict with the provisions of the enabling act, and as supplemented by the provisions of this ordinance, and the returns thereof shall be made as provided by said enabling act as hereinbefore set out.

"Sec. 20. There shall be submitted separately and in the manner herein provided, the separate provision adopted by this convention and referred to as a separate provision for state-wide prohibition, at the same time and on the same ballot, at which said proposed constitution is to be submitted for ratification or rejection, said proposition being as to whether or not the manufacture, sale, barter, giving away or otherwise furnishing intoxicating liquors shall be prohibited in the proposed state for a period of twenty-one years from the date of its admission into the Union, and thereafter until the people of the state shall otherwise provide by amendment of said constitution and proper state legislation, said provision being in words and figures as follows, to wit:

"The manufacture, sale, barter, giving away, or otherwise furnishing, except as hereinafter provided, of intoxicating liquors within this state, or any part thereof, is prohibited for a period of twenty-one years from the date of the admission of this state into the Union, and thereafter until the people of the state shall otherwise provide by amendment of this constitution and proper state legislation. Any person, individual or corporate, who shall manufacture,

sell, barter, give away, or otherwise furnish any intoxicating liquor of any kind, including beer, ale and wine, contrary to the provisions of this section, or who shall, within this state, advertise for sale or solicit the purchase of any such liquors, or who shall ship or in any way convey such liquors from one place within this state to another place therein, except the conveyance of a lawful purchase as herein authorized, shall be punished, on conviction thereof, by fine not less than fifty dollars and by imprisonment not less than thirty days of each offense: Provided, that the legislature may provide by law for one agency under the supervision of the state in each incorporated town of not less than two thousand population in this state; and if there be no incorporated town of two thousand population in any county in this state, such county shall be entitled to have one such agency, for the sale of such liquors for medicinal purposes; and for the sale, for industrial purposes, of alcohol which shall have been denaturized by some process approved by the United States commissioner of internal revenue; and for the sale of alcohol for scientific purposes to such scientific institutions, universities, and colleges as are authorized to procure the same free of tax under the laws of the United States; and for the sale of such liquors to any apothecary who shall have executed an approved bond, in a sum not less than one thousand dollars, conditioned that none of such liquors shall be used or disposed of for any purpose other than in the compounding of prescriptions or other medicines, the sale of which would not subject him to the payment of a special tax required of liquor dealers by the United States, and the payment of such special tax by any person within this state shall constitute *prima facie* evidence of his intention to violate the provisions of this section. No sale shall be made except upon the sworn statement of the applicant in writting setting forth the purpose for which the liquor is to be used, and no sale shall be made for medicinal pur-

poses except sales to apothecaries as hereinabove provided unless such statement shall be accompanied by a *bona fide* prescription signed by a regular practicing physician, which prescription shall not be filled more than once.   Each sale shall be duly registered, and the register thereof, together with the affidavits and prescriptions pertaining thereto shall be open to inspection by any officer or citizen of the state at all times during business hours.   Any person who shall knowingly make a false affidavit for the purpose aforesaid shall be deemed guilty of perjury.   Any physician who shall prescribe any such liquor, except for treatment of disease which after his own personal diagnosis he shall deem to require such treatment, shall, upon conviction thereof, be punished for each offense by fine of not less than two hundred dollars or by imprisonment for not less than thirty days, or by both such fine and imprisonment; and any person connected with any such agency who shall be convicted of making any sale or other disposition of liquor contrary to these provisions shall be punished by imprisonment of not less than one year and one day.   Upon the admission of this state into the Union these provisions shall be immediately enforceable in the courts of this state: Provided, that there shall be submitted separately at the same election at which this constitution is submitted for ratification or rejection, and on the same ballot, the foregoing provision, entitled 'Prohibition,' on which ballot shall be printed:

"Shall the Provision for State-Wide Prohibition be Adopted?

"☐   Yes.

"☐   No.

"And, Provided further, that if a majority of the votes cast for and against state-wide prohibition are for state-wide prohibition, then said provision entitled 'Prohibition,' shall be and form a part of this constitution and be in full

force and effect as such as provided therein; but if a majority of said votes shall be against state wide prohibition, then the provisions of said article shall not form a part of this constitution, and shall be null and void. If a majority of the votes cast for or against said provision are for state wide prohibition, then said provision entitled 'Prohibition' shall be and form a part of the proposed constitution.

"Sec. 21.    It shall be the duty of the governor of the Territory of Oklahoma, as such, within twenty days after the date of the adoption of this ordinance, to issue his proclamation giving public notice of the elections herein provided for, and to cause said proclamation to be published for a period of sixty days in some daily newspaper of general circulation within the proposed state of Oklahoma, and in the event of the failure or refusal or disqualification on the part of such governor to act, such proclamation shall be issued and publication caused to be made by Wm. H. Murray as president of this convention, and if he shall fail or refuse or be disqualified from issuing such proclamation, the same shall be issued and caused to be published as aforesaid by John M. Young as secretary of this convention.

"Sec. 22, That the provisions of this ordinance shall apply to the elections to be held and to the officers to be elected on the 6th day of August in the year of our Lord, one thousand nine hundred and seven.

"Sec. 23. In the event the governor of the Territory of Oklahoma should fail or refuse to act as herein provided, and to appoint two qualified electors from each of the political parties that cast the largest number of votes in said proposed state in the election of delegates to the constitutional convention, to constitute a board of election commissioners for the purposes of the elections herein provided for or perform any other duties imposed by law or this ordinance upon him with respect to said elections, such duty

shall be performed by Wm. H. Murray as president of this convention in the same manner as would devolve upon the governor, and with the same powers as if he were then and there governor of the Territory of Oklahoma, and in the event said Wm. H. Murray, as president, should fail or refuse to perform such acts and duties as aforesaid such acts and duties shall be performed by John M. Young as secretary of this convention in the same manner and with the same powers as if he were then and there the governor of said territory.

"Sec. 24.  In the event there should be any county or counties in said proposed state as defined and described in the constitution, where the same shall not have been divided into commissioner districts by July 6th, 1907, the commissioners for such county shall at said election be elected therefrom at large.

"Sec. 25.  No voting precinct in this state shall be established so that it shall be divided by the boundary line of any municipal township, commissioner's district, county or congressional district.

"Sec. 26.  Within ten days after the adoption of this ordinance or as soon thereafter as practicable, the county clerk and the county commissioners appointed herein shall meet at the county seat of their respective counties and subscribe the oath required by this ordinance and execute bond for the faithful performance of their duties in the penal sum of one thousand ($1,000) dollars, which bond may be approved by any delegate to the constitutional convention residing in the county or by Wm. H. Murray, as president of this convention.

"Thereupon the board of county commissioners of each of said counties shall procure a suitable book in which the oath and bond aforesaid and all the proceedings shall be entered.

"I hereby certify that the above and foregoing passed

after third reading upon roll call, this 22nd day of April, at 4:32 o'clock p. m., Anno Domini, 1907.

"WM. H. MURRAY.

"President of the Constitutional Convention.

"ATTEST                    "JOHN McLAIN YOUNG.

"Secretary of the Constitutional Convention."

Opinion of the court by

HAINER, J.:  In compliance with the power granted in the enabling act, the people of Oklahoma and Indian Territory elected one hundred and twelve delegates, fifty-seven of whom were elected from the Territory of Oklahoma, and fifty-five of whom were elected from the Indian Territory.  These delegates were invested with the power and charged with the duty and responsibility of forming a constitution and state government for the proposed state of Oklahoma.

THE FUNDAMENTAL RIGHTS AND POWERS OF THE CONVENTION.

The first question for our consideration is: What is a constitutional convention, and what is the nature of its fundamental rights and powers?

It was contended by the plaintiff in the court below, defendant in error here, that the power and authority of the constitutional convention is derived solely from the powers granted in the enabling act, and that every power granted to the convention must be found and expressed therein, except such implied powers as may be necessary to carry into effect the express grant of power; that the power granted by the enabling act embraces no *legislative grant;* but confers *only the power of a committee to adopt and propose fundamental propositions* which upon ratification may

become the fundamental law of the state and this was the view of the trial court; and it is earnestly urged in this court by counsel for defendant in error as the true doctrine. In our opinion, this contention is clearly untenable, and cannot be sustained by the authorities.

In a territory the source of all power is congress.    But in the formation of a constitution and· state government the power emanates from the people.    The delegates to the convention were not the agents or representatives of congress, but they were the immediate agents and representatives of the people of the two territories.    They derived their power and authority from the people in their sovereign capacity. And this is in harmony with the principles of the Declaration of Independence, which declares that "Governments are instituted among men, deriving their just powers from the consent of the governed," and is in keeping with the doctrine announced by Lincoln when he uttered the immortal words, that this is "A government of the people, by the people, and for the people."

In *Benner v. Porter,* 9 How. 241, the supreme court of the United States, in speaking of the source of power, with reference to the admission of the Territory of Florida, said:

"The convention being the foundation of all political power, from which flowed that which was embodied in the organic law, were, of course, competent to prescribe the laws and appoint the officers under the constitution, by means whereof the government could be put into immediate operation."

The convention, therefore, was created by the direct action of the people, and in the discharge of its powers, duties,

. and obligations, it performs one of the highest and most important acts of popular sovereignty. Nor is the contention well founded that the convention possesses no legislative powers, and that it acts in the mere capacity of *a committee to adopt and propose fundamental propositions* which are to be submitted to a vote of the people for ratification or rejection. The convention has and can exercise plenary powers subject to the limitations: (1)   That the constitution shall be republican in form:   (2)   That it shall not be repugnant to the constitution of the United States and the principles of the Declaration of Independence: (3)     That no distinction shall be made on account or race or color: and (4) That the convention shall accept by ordinance irrevocable all the terms and conditions of the enabling act.

It is true that congress has the power to impose conditions upon a territory, as a condition precedent to entitle it to admission as a state. Accordingly, congress placed certain restrictions and limitations upon the convention, which it was required to incorporate into the constitution, and to be ratified by the people. These limitations and restrictions, when ratified by the people, become a part of the fundamental law of the state. When, therefore, congress authorized the people of Oklahoma and Indian Territory to form a constitution and state government and be admitted into the Union on an equal footing with the original states, it meant that it should be admitted on equal terms with the original states. Hence, the enabling act was not a limited or restricted grant, but it was an absolute grant, subject to the constitution of the United States, and the limitations and

restrictions imposed in the enabling act as a condition precedent to such admission.

In *Permoli v. First Municipality,* 3 How. 609, the supreme court of the United States had before it the construction of the act of congress of February 20, 1811, authorizing the people of the Territory of Orleans to form a constitution and state government, and in the course of the opinion the court said:

"By the act of April 8, 1812, Louisiana was admitted according to the mode prescribed by the act of 1811. Congress declared it should be on the conditions and terms contained in the 3rd section of that act, which should be considered, deemed and taken, as fundamental conditions and terms upon which the state was incorporated in the union.

"All congress intended, was to declare in advance to the people of the territory, the fundamental principles their constitution should contain, this was in every way proper under the circumstances; the instrument having been duly formed, and presented, it was for the national legislature to judge whether it contained the proper principles, and to accept it if it did, or reject it if it did not. Having accepted the constitution and admitted the states, 'On an equal footing with the original states in all respects whatever,' in express terms, by the act of 1812, congress was concluded from assuming that the instructions contained in the act of 1811 had not been complied with. No fundamental principles could be added by way of amendment, as this would have been making part of the state constitution; if congress could make it in part, it might, in the form of amendment, make it entire."

In *Escanaba Co. v. Chicago,* 107 U. S. 638, the supreme court of the United States, speaking by Mr. Justice Field, said:

"Although the act of April 18, 1818, c. 67, enabling the people of Illinois Territory to form a constitution and state government, and the resolution of congress of Dec. 3, 1818, declaring the admission of the state in the Union, refer to the principles of the ordinance according to which the constitution was to be formed, its provisions could not control the authority and powers of the state after her admission. Whatever the limitations upon her powers as a government whilst in a territorial condition, whether from the ordinance of 1787 or the legislation of congress, it ceased to have any operative force, except as voluntarily adopted by her, after she became a state of the Union. On her admission she at once became entitled to and possessed of all the rights of dominion and sovereignty which belonged to the original states. She was admitted, and could be admitted, only on the same footing with them."

In *Ward v. Race Horse*, 163 U. S. 514, which involved the interpretation of a provision of the enabling act of Wyoming, Mr. Justice White, after reviewing the authorities, said:

"The enabling act declares that the state of Wyoming is admitted on equal terms with the other states, and this declaration which is simply an expression of the general rule, which presupposes that states, when admitted into the Union, are endowed with powers and attributes equal in scope to those enjoyed by the states already admitted, repels any presumption that in this particular case congress intended to admit the state of Wyoming with diminished governmental authority."

From these decisions it will be observed that all congress intended was to declare to the people of Oklahoma and Indian Territory the fundamental principles which should be incorporated in the proposed constitution, and when the

constitution is formed and a full state government provided, it should be submitted to the people for ratification or rejection, and when approved by the people it is to be submitted to the President of the United States, who is charged by congress with the duty to determine whether the constitution is republican in form, whether it is repugnant to the constitution of the United States and the principles of the Declaration of Independence, and whether the terms and conditions imposed in the enabling act have been complied with.

Judge Story, in his work on the Constitution, vol. 1 (5 ed.), section 338, declares:

"The *true view* to be taken of our state constitutions is that they are forms of government ordained and established by the people in their *original sovereign* capacity to promote their own happiness and permanently to secure their rights, property, independence, and common welfare."..

Judge Cooley, in his work on Constitutional Limitations, an page 68, in discussing the attributes and objects of a constitution, says:

"In considering state constitutions we must not commit the mistake of supposing that, because individual rights are guarded and protected by them, they must also be considered as owing their origin to them. These instruments measure the powers of the rulers, but they do not measure the rights of the governed. What is a constitution, and what are its objects? It is easier to tell what it is not, than what it is. It is not the beginning of a community, nor the origin of private rights; it is not the fountain of law, nor the incipient state of government; it is not the cause but consequence, of personal and political freedom; it grants no rights to the people, but is the creature of their power, the instrument of their convenience."

In 1894 the state of New York had under consideration the revision of its state constitution. One of the first questions that arose in the convention was the ascertainment of the rights and powers of the convention to pass upon the election and qualifications of one of its members. This question was referred to the judiciary committee, of which committee the Honorable Elihu Root, now secretary of state, and one of the ablest lawyers and statesmen of this country, was chairman. In his report to the convention, he says:

"The convention has been created by the direct action ot the people and has been by them vested with the power and charged with the duty to revise and amend the organic law of the state.

"The function with which it is thus charged is a part of the highest and most solemn act of popular sovereignty and in its performance the convention has and can have no superior but the people themselves.

"No court or legislature or executive officer has authority to interfere with the exercise of the powers .or the performance of the duties which the people have enjoined upon this, their immediate agent."

And, again, in stating the nature of a constitutional convention, he says:

"A constitutional convention is a legislative body of the highest order. It proceeds by legislative methods. Its acts are legislative acts. Its function is not to execute or interpret laws, but to make them. That the consent of the general body of electors may be necessary to give effect to the ordinances of the convention no more changes their legislative character than the requirement of the governor's consent changes the nature of the action of the senate and assembly."

And, again, in speaking of the importance of the independence of the convention, he uses this language:

"It is far more important that a constitutional convention should possess these safeguards of its independence than it is for an ordinary legislature; because the convention acts are of a more momentous and lasting consequence and because it has to pass upon the power, emoluments and the very existence of the judicial and legislative officers who might otherwise interfere with it. The convention furnishes the only way by which the people can exercise their will, in respect of these officers, and their control over the convention would be wholly incompatible with the free exercise of that will." Proceedings of the New York Constitutional Constitution, 1894, pages 79-80.

Mr. Bryce, in his excellent work on the American Commonwealth, vol. 1, page 436, says:

"A state constitution is really nothing but a law made *directly* by the *people* voting at the polls upon a draft submitted to them. The people of a state when they so vote act as a primary and constituent assembly, just as if they were all summond to meet in one place like the folk-notes of our Teutonic forefathers, it is only their numbers that prevents them from so meeting in one place, and oblige the vote to be taken in a variety of polling places. Hence the enactment of a constitution is an exercise of direct popular sovereignty to which we find few parallels in modern Europe, though it was familiar enough to the republic of antiquity and has lasted until now in some of the cantons of Switzerland."

In *Goodrich v. Moore*, 2 Minn. 49, the supreme court of Minnesota declared that a constitutional convention is the highest legislative assembly recognized in law, invested with the power of enacting or framing the supreme law of

the state, and in the course of the opinion, Mr. Justice Atwater, speaking for the court, said:

"But even had the legislature intended and attempted to claim and exercise the act of providing a printer for the constitutional convention, it would have been an unauthorized and unwarrantable interference with the rights of that body. The admission of such a right in the legislature would place the convention under its entire control, leaving it without authority even to appoint or elect its own officers, or adopt measures for the transaction of its legitimate business. It would have less power than a town meeting, and be incompetent to perform the objects for which it convened. It would be absurd to suppose a constitutional convention had only such limited authority. *It is the highest legislative assembly recognized in law, invested with the right of enacting or framing the supreme law of the state.* It must have plenary power for this and over all the incidents thereof. The fact that the convention assembled by authority of the legislature renders it in no respect inferior thereto.

In *Sproule v. Fredericks,* 11 So. Rep. 472, the supreme court of Mississippi, in discussing the powers of the convention says:

"It is the highest legislative body known to freemen in a representative government. It is supreme in its sphere. It wields the powers of sovereignty, specially delegated to it, for the purpose and the occasion, by the whole electoral body, for the good of the whole commonwealth. The sole limitation upon its powers is that no change in the form of government shall be done or attempted. The spirit of republicanism must breathe through every part of the framework, but the particular fashioning of the parts of this framework is confided to the wisdom, the faithfulness, and

the patriotism of this great convocation, representing the people in their sovereignty. The theorizing of the political essayist and the legal *doctrinaire*, by which it is sought to be established that the expression of the will of the legislature shall fetter and control the constitution-making body, or, in the absence of such attempted legislative direction, which seeks to teach that the constitutional convention can only prepare the frame of a constitution and recommend it to the people for adoption, will be found to degrade this sovereign body below the level of the lowest tribunal clothed with ordinary legislative powers."

In *Loomis v. Jackson,* 6 W. Va. 613, in discussing the powers of the constitutional convention, Judge Woods, speaking for the court, on page 708 of the opinion, said:

"I have had no difficulty in reaching the following conclusions upon the constitutional questions presented in this specification, viz:

"First, that a constitutional convention lawfully convened does not derive its powers from the legislature, but from the people:

"Second, that the powers of a constitutional convention are in the nature of sovereign powers:

"Third, that the legislature can neither limit or restrict them in the exercise of these powers."

In the recent case of *Montana ex rel. Haire v. Rice,* 204 U. S. 291, which came up on appeal from the decision of the supreme court of Montana, it was held that:

"In granting lands for educational purposes to Montana, sec| 17, of the enabling act of February 22, 1889, 25 Stat. 676, to be held, appropriated, etc., in such manner as the legislature of the state should provide, congress intended to designate, and the act will be so construed, such legislature as should be established by the constitution to be

adopted, and which should act as a parliamentary body in subordination to that constitution; and it did not give the management and disposal of such lands to the legislature or its members independently of the methods and limitations prescribed by the constitution of the state."

The facts in this case were substantially as follows: By section 17 of the enabling act for Montana grants were made to the state in the following terms:

"To the state of Montana: For the establishment and maintenance of a school of mines, one hundred thousand acres; for state normal school, one hundred thousand acres; for agricultural colleges, in addition to the grant hereinbefore made for that purpose, fifty thousand acres; for the establishment of a state reform school, fifty thousand acres; for the establishment of a deaf and dumb asylum, fifty thousand acres; for public buildings at the capital of the state, in addition to the grant hereinbefore made for the purpose, one hundred and fifty thousand acres.

" *  *  * And the lands granted by this section shall be held, appropriated and disposed of exclusively for the purposes herein mentioned, in such manner as the legislatures of the respective states may severally provide."

The constitutional convention of Montana adopted an ordinance designated as "Ordinance No. 1," entitled "Federal Relations," which ordained that "The state hereby accepts the several grants of land from the United States to the state of Montana, *  *  * upon the terms and conditions therein provided." An act of the legislative assembly of the state of Montana, approved February 2, 1905, authorized and directed the state board of land commissioners to sign and issue interest-bearing bonds to the amount of $75,000, for the principal and interest of which the state

of Montana should not be liable, and directed the state treasurer to sell the bonds.  Section 7 directed that:

"The moneys derived from the sale of said bonds shall be used to erect, furnish and equip an addition to the present state normal school building at Dillon, Montana, and shall be paid out for such purpose by the state treasurer upon vouchers approved by the executive board of the state normal school, and allowed and ordered paid by the state board of examiners."

Section 12, article XI, of the constitution of the state of Montana is as follows:

"The funds of the state university and all other state institutions of learning, from whatever source accruing, shall forever remain inviolate and sacred to the purpose for which they were dedicated.  The various funds shall be respectively invested under such regulations as may be prescribed by law, and shall be guaranteed by the state against loss or diversion.  The interest of said invested funds, together with the rents from leased lands or properities, shall be devoted to the *maintenance* and *perpetuation* of these respective institutions."

It will thus be seen that by the terms of the enabling act it was provided that the lands granted to the state were for the *establishment* and *maintenance* of a school of mines, and for a state normal school, etc., and that the lands thus granted should "Be held, appropriated and disposed of" exclusively for the purposes therein named, and "In such manner as the legislature of the state may provide." The constitution expressly provided that "The interest of said invested funds, together with the rents from leased lands or properties, shall be devoted to the *maintenance and perpetua-*

*tion* of these respective institutions." Notwithstanding the limitations placed upon these lands and funds by the state constitution, the legislature of the state of Montana authorized and directed the state board of land commissioners to issue bonds the proceeds of which were to be used to erect, furnish and equip an addition to a state normal school, upon the theory that the enabling act conferred such power upon the legislature, regardless of the limitations placed upon it by the state constitution.

It was contended in that case, as it is here, that the provisions of the enabling act, in respect to the disposition of these lands and funds controlled over the provisions contained in the constitution. The supreme court of the United States denied this contention, and held that in executing the authority entrusted to it by congress, the legislature must act in subordination to the state constitution. Mr. Justice Moody, in delivering the opinion of the court, on pages 299, 300 uses the following language:

"In support of it the plaintiff in error argues that the grant of all the land by the enabling act was by an ordinance accepted by the state 'Upon the terms and conditions therein provided;' that the legislature of the state was by the last clause of section 17 appointed as agent of the United States, with full power to dispose of the lands in any manner which it deemed fitting, provided only that the lands or their proceeds should be devoted to normal school purposes, and that, therefore, in the execution of this agency the legislature was not and could not be restrained by the provisions of the state constitution. It is vitally necessary to the conclusion reached by these arguments that the enabling act should be interpreted as constituting the legis-

lature, as a body of individuals and not as a parliamentary body, the agent of the United States. But it is not susceptible of such an interpretation. It granted the lands to the state of Montana, and the title to them, when selected, vested in the grantee. In the same act the people of the territory, about to become a state, were authorized to choose delegates to a convention charged with the duty of form-ing a constitution and state government. It was contemp-lated by congress that the convention would create the leg-islature, determine its place in the state government, its relations to the other governmental agencies, its methods of procedure, and, in accordance with the universal practice of the states, limit its powers. It is not to be supposed that congress intended that the authority conferred by section 17 of the enabling act upon the legislature should be ex-ercised by mere ascertainment of its will, perhaps when not in stated session, or by a majority of the votes of the two houses, sitting together, or without the assent of the executive, or independently of the methods and limitations upon its powers prescribed by its creator. On the contrary, the natural inference is that congress, in designating the legislature as the agency to deal with the lands, intended such a legislature as would be established by the constitution of the state. It was to a legislature whose powers were certain to be limited by the organic law, to a legislature as a parliamentary body, acting within its lawful powers, and by parliamentary methods, and not to the collection of in-dividuals, who for the time being might happen to be mem-bers of that body that the authority over these lands was given by the enabling act. It follows, therefore, that in executing the authority entrusted to it by congress, the leg-islature must act in subordination to the state constitution, and we think that in so holding the supreme court of the state committed no error."

But counsel for defendant in error rely upon the case of *Wells v. Bain,* 75 Pa. St. 39, in support of their contention that the convention possesses only such powers as are expressly granted in the enabling act, and such implied or incidental powers as are necessary to carry into effect the express powers thus granted by congress, and that if the convention exceeds such powers, then the powers of the courts can be invoked to enjoin or restrain it from submitting such propositions in the constitution or ordinance to a vote of the people. In this case, it appears that an act of the legislature authorized, in pursuance of a vote of the people, the election of delegates to a convention to revise and amend the constitution, and directed the convention to submit the proposed amendments to the voters of the state at such time and "In such manner as the convention shall prescribe," but also directed that the election to decide for or against the amendments "Shall be conducted as the general elections of this commonwealth are now by law conducted." By the then existing election laws, the elections were conducted by inspectors. The convention, by an ordinance, appointed certain persons to have direction of the election on amendments, to fill vacancies, to appoint judges and inspectors, etc. And it was there held that the part of the ordinance relating to the election was in conflict with the election laws enacted by the state legislature, and was therefore void. But in this case there was no attempt to enjoin the submission of the constitution, or any of its provisions, to a vote of the people; nor was there any attempt to restrain or enjoin the convention, its officers or delegates, from discharging their functions. But the action

was instituted after the convention had completed its labors, and it had for its object the sole purpose of enjoining that portion of the ordinance which attempted to create election officers which were unauthorized, and who were attempting to supplant or supersede the officers who were charged, as it was there contended and held, with the duty of conducting such election by virtue of an act of the legislature, which provided for the election of delegates to amend and revise the constitution. This decision seems to be in irreconcilable conflict with the decisions of the highest courts of the land. The convention was authorized by a direct vote of the people to revise and amend the state constitution. The power of the convention to revise and amend the constitution was not a delegated power derived from the legislature, but it derived its power directly from the people. And in the performance of the powers and duties and obligations resting upon the convention, it could have no superior but the people themselves. Manifestly, to hold otherwise would be to degrade the powers of the convention below the level of the lowest legislative or municipal body. Clearly, such is not the office, functions, and powers of the constitutional convention. This decision was severly criticised at the time by the ablest members of the bar of the state, and was repudiated by the constitutional convention of New York of 1894, which was composed of some of the greatest lawyers and most eminent statesmen of our times.

THE COURTS HAVE NO POWER TO RESTRAIN OR ENJOIN THE
CONVENTION.

The convention being vested with legislative powers and functions its acts and proceedings, in the performance of

such duties, are not subject to judicial control or interfer-ence. The power of the courts to enjoin or restrain the convention, its officers or delegates, from exercising the rights, powers, and duties confided to them must, therefore, be denied. Nor have the courts the power or jurisdiction to enjoin or restrain the submission of the constitution or any proposition contained therein to a vote of the people. This conclusion it seems to us, is self-evident. No case has been cited, and we are unable, by the most diligent research, to find a case, from the foundation of the government down to the present time where any court has ever restrained or enjoined a constitutional convention, its officers or members: •Nor has any case been cited or found where the constitution, or any of the propositions contained therein, was ever enjoined by any court prior to the time the constitution was adopted. If, therefore, the convention, or its officers and delegates, could be enjoined by the courts from exercising legislative functions, such as the creating and defining of counties in Oklahoma or Indian Territory, or on defining and describing the boundaries of the counties in the proposed state, and which in effect would divide or change the counties as they now exist in the Territory of Oklahoma, and if this part of the constitution could be restrained and enjoined from being submitted to a vote of the people, then we can perceive of no sound reason why any other portion of the constitution could not be attacked in the courts and its constitutionality determined in advance of the submission of such question or proposition to the vote of the people. To concede the power of the courts to enjoin and restrain the convention in the exercise of its

powers in incorporating any legislative matter that it may deem appropriate therein, on the ground that it is unconstitutional and void, in advance of the submission of the same to the people for ratification or rejection, and prior to the time that it is approved by the President, would, it seems to us, lead to interminable litigation, and the inevitable result would be to tie the hands of the convention and indefinitely postpone the submission of the constitution or any of its provisions, to a vote of the people. Fortunately, such is not the law. If the constitution, or any of its provisions, is repugnant to the constitution of the United States or any of the terms and conditions of the enabling act, these questions can be litigated and determined at the appropriate time. The moment the constitution is ratified by the people, and approved by the President of the United States, then every section, clause, and provision therein becomes subject to judicial cognizance. That the courts will not interfere by injunction, or otherwise, with the exercise of legislative or political functions, is well settled by a long line of adjudicated cases which we will review at some length, owing to the great importance of the questions involved in this case.

As early as 1831 this question was before the supreme court of the United States in a suit brought by the Cherokee Nation against the state of Georgia, 5 Pet. 1. This was a bill in equity brought by the Cherokee Nation, praying an injunction to restrain the state of Georgia from the execution of certain laws of that state, which it was alleged would annihilate the Cherokee Nation as a political society, and seize for the use of Georgia the lands of the nation which had been assured to them by the United States, in

solemn treaties repeatedly made and still in force. The opinion of the court in this case was delivered by Mr. Chief Justice Marshall, and in the course of the opinion, on page 18, the learned chief justice says:

"A serious additional objection exists to the jurisdiction of the court. Is the matter of the bill the proper subject for judicial inquiry and decision? It seeks to restrain a state from the forcible exercise of legislative power over a neighboring people, asserting their independence; their right to which the state denies. On several of the matters alleged in the bill, for example, on the laws ·making it criminal to exercise the usual powers of self-government in their own country, by the Cherokee Nation, this court cannot interpose; at least, in the form in which these matters are presented.

"That part of the bill which respects the land occupied by the Indians, and prays the aid of the court to protect their possession, may be more doubtful. The mere question of right might, perhaps, be decided by this court, in a proper case, with proper parties. But the court is asked to do more than decide on the title. The bill required us to control the legislature of Georgia, and to restrain the exertion of its physical force. The propriety of such an interposition by the court may be well questioned; it savors too much of the exercise of political power, to be within the proper province of the judicial department. But the opinion on the point respecting parties makes .it unnecessary to decide this question.

"If it be true, that the Cherokee Nation have rights, this is not the tribunal in which those rights are to be asserted. If it be true, that wrongs have been inflicted, and that still greater are to be apprehended, this is not the tribunal which can redress the past or prevent the future. The motion for an injunction is denied."

In the case of *The State of Mississippi v. Johnson*, 4 Wall. 475, the supreme court of the United States was asked to restrain and enjoin Andrew Johnson, then President of the United States, and a citizen of Tennessee, from enforcing the acts of congress of March 2 and 23 1867, commonly known as the "Reconstruction Acts" on the ground that such acts were unconstitutional and void. Chief Justice Chase, speaking for the court, in the course of the opinion said:

"Congress is the legislative department of the government; the President is the executive department. Neither can be restrained in its action by the judicial department; though the acts of both, when performed, are, in proper cases subject to its cognizance."

And, again, he says:

"It is true that a state may file an original bill in this court. And it may be true, in some cases, that such a bill may be filed against the United States. But we are fully satisfied that this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties; and that no such bill ought to be received by us. * * * * * The motion for leave to file the bill is, therefore, denied."

In the case of *State of Georgia v. Stanton*, 6 Wall. 50, the supreme court of the United States had before it for decision a bill in equity, filed by the state of Georgia, seeking to enjoin the secretary of war, and other officers who represented the executive authority of the United States, from carrying into execution certain acts of congress, on the ground that such execution would annul and totally abolish the existing state government of the state and estab-

lish another and different one in its place. In other words, would overthrow and destroy the corporate existence of the state by depriving it of all the means and instrumentalities whereby its existence might, and otherwise would, be maintained. It was held that the bill called for a judgment upon a political question, and would therefore not be entertained by the court. Mr. Justice Nelson, speaking for the court, on page 77 of the opinion, says:

"That these matters, both as stated in the body of the bill, and, in the prayers for relief, call for the judgment of the court upon political questions, and, upon rights, not of persons or property, but of a political character, will hardly be denied. For the rights for the protection of which our authority is invoked, are the rights of sovereignty, of political jurisdiction, of government, of corporate existence as a state, with all its constitutional powers and privileges. No case of private rights or private property infringed, or in danger of actual or threatened infringment, is presented by the bill, in judicial form, for the judgment of the court."

In *New Orleans Water Works Company v. New Orleans,* 164 U. S. 471, the supreme court of the United States had under consideration the question whether the court would enjoin and restrain a municipal council in the exercise of its powers as a legislative body, and it was there held that:

"A court of equity cannot properly interfere with, or in advance restrain the discretion of a municipal body while it is in the exercise of powers that are legislative in their character."

In the court of the opinion, Mr. Justice Harlan, speaking for the court, says:

"If it be said that a final decree against the city, en-
joining it from making such grants in the future, will con-
trol the future action of the city council of New Orleans,
and will, therefore, tend to protect the plaintiff in its rights,
our answer is that a court of equity cannot properly inter-
fere with, or in advance restrain, the discretion of a muni-
cipal body while it is in the exercise of powers that are legis-
lative in their character. It ought not to attempt to do
indirectly what it could not do directly. In view of the
adjudged cases, it cannot be doubted that the legislature
may delegate to municipal assemblies the power of enacting
ordinances that relate to local matters, and that such ordi-
nances, if legally enacted, have the force of laws passed by
the legislature of the State and are to be respected by all.
But the courts will pass the line that separates judicial from
legislative authority if by any order or in any mode they
assume to control the discretion with which municipal as-
semblies are invested, when deliberating upon the adoption
or rejection of ordinances proposed for their adoption. The
passage of ordinance by such bodies are legislative acts
which a court of equity will not enjoin. *Chicago v. Evans,*
24 Ill. 52, 57: *Des Moines Gas Co. v. Des Moines,* 44 Iowa,
505; 1, Dillon on Mun. Corp. sec. 308, and notes; 2 High
on Injunctions, sec. 1246. If an ordinance be passed and is
invalid, the jurisdiction of the courts may then be invoked
for the protection of private rights that may be violated by
its enforcement. *Page v. Case,* 34 Maryland, 558, 664;
*Baltimore v. Radecke,* 49 Maryland, 217, 231."

In *State ex rel. Rose v. Superior Court of Milwaukee*
*County,* decided by the supreme court of Wisconsin February
27, 1900, and reported in 48 L. R. A. 819, it was held that
the passage of an ordinance of the city of Milwaukee was
a legislative power and that a court of equity had no juris-
diction to restrain the common council from passing the

same. In this case the court had under consideration the validity of an ordinance which the common council of the city of Milwaukee attempted to enact. The action was instituted in the superior court of Milwaukee county, having for its object the restraining and enjoining of the common council from enacting the ordinance. The court granted the injunction as prayed for. Notwithstanding the injunction, the common council violated the orders of the court, and proceeded to enact the ordinance. The members were accordingly cited to appear before the court, to show cause why they should not be punished for contempt. Upon the hearing, a majority of the common council admitted to the trial court that they had severally violated the injunction order in question. The only excuse given for the violation was that the court was without jurisdiction to make the order. Therefore, the sole legal question presented was whether the court had jurisdiction of the subject-matter. The trial court held that it had jurisdiction of the subject-matter of the action, and adjudged the common council guilty of contempt. Upon this order and judgment of the trial court, application was made to the supreme court for a peremptory writ of prohibition, to prohibit the execution of the judgment, and, upon a full hearing and consideration, the writ was awarded, the supreme court holding that the trial court was without jurisdiction of the subject-matter of the action. In the course of the opinion, Mr. Chief Justice Cassoday, speaking for the court, says:

"The power so vested in the common council is, within the limits prescribed, a discretionary power; and we must hold that a court of equity has no jurisdiction to restrain

the common council from exercising such discretion, espe-
cially at the suit of a private party. It is said that the
amendment to the ordinance, as originally proposed, was
not submitted to a committee as required. It is enough to
say that a court of equity has no place in the chamber of
the common council to supervise or superintend the proceed-
ings of that body, while engaged in the exercise of legisla-
tive or discretionary functions. The common council of
Milwaukee, like other legislative bodies and courts, is liable
to commit errors which may be fatal to its action; but that
does not take away its power to act."

In *The Des Moines Gas Co. v. The City of Des Moines,*
44 Iowa, 505, it was said by the supreme court of Iowa,
having this question under consideration:

"The general assembly is a co-ordinate branch of the
state government, and so is the law-making power of public
municipal corporations within the prescribed limits. It
is no more competent for the judiciary to interfere with the
legislative acts of the one than the other. But the uncon-
stitutional acts of either may be annulled. Certainly the
passage of an unconstitutional law by the general assembly
could not be enjoined. If so, under the pretense that any
proposed law was of that character, the judiciary could ar-
rest the wheels of legislation."

It is evident, then, from a consideration of the author-
ities, that the constitutional convention is a legislative body
of the highest order, and that it cannot be interfered with
by injunction in the exercise of its powers. This being true,
the convention was given the power, and it was made its
duty, to do two things: First, to form a constitution; and
second, to form a state government.

### THE CONSTITUTION AND STATE GOVERNMENT.

First, let us briefly examine the difference between the federal and state governments. Judge Cooley, in his great work on Constitutional Limitations (7 ed.), page 11, states this distinction as follows:

"The government of the United States is one of *enumerated powers;* the national constitution being the instrument which specifies them, and in which authority should be found for the exercise of any power which the national government assumes to possess. In this respect it differs from the constitutions of the several states, which are not grants of· powers to the states, but which apportion and impose restrictions upon the powers which the states inherently possess."

Mr. Chief Justice Waite, in *United States v. Cruikshank,* 92 U. S. 549, states the true doctrine as follows:

"The government of the United States is one of delegated powers alone. Its authority is defined and limited by the constitution. All powers are not granted to it by that instrument are reserved to the state or to the people. No rights can be acquired under the constitution or laws of the United States except such as the government of the United States has the authority to grant or secure. All that cannot be so granted or secured are left under the protection of the states."

Chief Justice Marshall, in the celebrated case of *McCulloch v. Maryland,* 4 Wheat. 409, in speaking of the division of sovereignty appertaining to the United States and to the states, declared:

"Does it belong to one more than to another? In America, the powers of sovereignty are divided between the govern-

ment of the Union, and those of the states. They are each sovereign, with respect to the objects committed to it and neither is sovereign, with respect to the objects committed to the other."

What then is a state constitution, and what are its attributes?

Judge Story, in his work on the Constitution, vol. 1, sec. 339, says:

"A constitution is in fact a fundamental law or basis of government, and falls strictly within the definition of law as given by Mr. Justice Blackstone. It is a rule of action prescribed by the supreme power in a state, regulating the rights and duties of the whole community. It is a *rule,* as contradistinguished from a temporary or sudden order; permanent, uniform and universal."

The late Justice Miller, of the supreme court of the United States, in his valuable work on the Constitution, page 70, says:

"A constitution in the American sense of the word is the written instrument by which the fundamental powers of government are established, limited, and defined, and by which those powers are distributed among the several departments for their safe and useful exercise for the benefit of the body politic."

In *Vanhorne v. Dorrance,* 2 Dall. 308, the court defines a constitution as follows:

"What is a constitution? It is the form of government, delineated by the mighty hand of the people, in which certain first principles of fundamental laws are established. The constitution is certain and fixed; it contains the permanent will of the people, and is the supreme law of the land; it is

paramount to the power of the legislature, and can be re-
voked or altered only by the authority that made it."

In *Phoebe v. Jay.* 1 Ill. (Breese) 286, 271 the supreme
court of Illinois declared that:

"The term 'Constitution,' as applied to government, is
the form of government instituted by the people in their
sovereign capacity, in which, first, the principal and funda-
mental laws are established. A constitution is the supreme,
permanent, and fixed will of the people in their original,
unlimited, and sovereign capacity and in it are determined
the conditions, rights and duties of every individual of the
community."

The supreme court of Indiana, in the case of *In re
Denny,* 156 Ind. 104, 59 N. E. 359; said:

"In our system of government, a written constitution
is the highest expression of law; none other emanates directly
from the sovereign people themselves. It is the deliberate
and affirmative utterance of the sovereign majority."

In *Taylor v. Governor,* 1 Ark. 27, it is said:

"What is a constitution? The constitution of an Amer-
ican state is the supreme, organized, and written will of
the people acting in convention and assigning to the different
departments of the government their respective powers. It
may limit and control the action of these departments, or
it may confer upon them any extent of power not incompat-
ible with the federal compact. By an inspection and exam-
ination of all the constitutions of our own country they will
be found to be nothing more than so many restrictions and
limitations upon the departments of the government and the
people."

In 8 Cyc. 717, the doctrine is clearly stated as follows:

"A state constitution consists of a number of funda-
mental laws passed by, and alterable and repealable alone

by the people; it is superior to the will of the legislature, the validity of whose acts is determined by its provisions."

Citing with approval *Taylor v. Governor,* 1 Ark. 21, 27; *Lynn v. Polk,* 8 Lea. (Tenn.) 121, 165; and *Bates u Kimball,* 2 D. Chipm. (Vt.) 77, 84, where it is said:

"When the people associate and enter into compact for the purpose of establishing government, that compact, whatever may be its provisions, or in whatever language it may be written is the constitution of the state, revocable only by the people, or in the manner they prescribe."

In short, the constitutional convention, subject to the constitution of the United States and the limitations and restrictions contained in the enabling act, had full power and authority to incorporate in the constitution any provision which it deemed appropriate.

But this does not mean, as it was stated by the learned trial court, that if such power is conceded to the convention, it had "The power to repeal all laws, abolish all institutions, and displace all officers, from the highest to the very lowest." No such power was confided to the convention, nor has it exercised such powers. Clearly, to repeal existing laws of the territory, and to displace any existing officers, would be to act in direct opposition to the express provisions of section 6 of the enabling act, which provides:

"And the said representatives, together with the governor and other officers provided for in said constitution, shall be elected on the same day of the election for the ratification or rejection of the constitution; and until said officers are elected and qualified under the provisions of such constitution and the said State is admitted into the Union, *the territorial officers of Oklahoma Territory shall continue*

*to discharge the duties of their respective offices in said*
*territory."*

But, the grant by congress to form a constitution and
state government carries with it everything that is es-
sential to effectuate its object. We are unable to perceive
how a state government could be created, and officers for
a full state government provided for, unless the convention
had the power to fix and define the counties within the en-
tire state, and to provide by ordinance for necessary temp-
orary election machinery, and for putting the state govern-
ment into operation when the constitution is ratified by the
people and the President issues his proclamation admitting
the state into the Union on an equal footing with the orig-
inal states.

This leads us to the next question: What is a state
government, within the purview of the enabling act?

The convention was not only authorized to form a
constitution, but it was expressly authorized and empow-
ered to form a state government. It seems to us that the
creation of counties and townships is absolutely essential
and indispensable to the formation of a state goverment.
In fact, counties and townships have been inseparable parts
of every state government since the admission of the orig-
inal thirteen states into the Union. Indeed, such counties
antedate the adoption of the federal constitution. And it
will be presumed that when congress authorized the people
of Oklahoma and Indian Territory to form a constitution
and state government and be admitted into the Union on
an equal footing with the original states, it intended that
such a state government should be formed. No particular

form of government was prescribed, and the only limitations thereon are that the constitution and state government shall be republican in form, and not repugnant to the federal constitution and the principles of the Declaration of Independence, etc.

It is to be presumed that congress knew the conditions existing in the Indian Territory, and knew that no counties had been formed or created therein, and that it was absolutely essential for the convention to create counties, and to provide the necessary machinery for holding the election for submitting the constitution to a vote of the people. It also knew that the Territory of Oklahoma contained organized counties, and that each county had a full complement of county officers, and that they were exercising their powers and duties as such under the laws of Oklahoma Territory, except the Osage Indian Reservation, which was an unorganized county, and attached to Pawnee county, under the organic act, for judicial purposes. There was no inhibition placed upon the convention against creating and defining the counties in the proposed state, and the only inhibition placed upon the convention is that provided in section 21, with reference to the Osage Indian Reservation, where it is declared:

"That the constitutional convention may by ordinance provide for the election of officers for a full state government, including members of the legislature and five representatives to congress, and shall constitute the Osage Indian Reservation a separate county, and provide that it shall remain a separate county until the lands in the Osage Indian Reservation are allotted in severalty and until changed by the legislature of Oklahoma."

In the absence of any express prohibition upon the convention, it had full and complete power to establish and define all the counties in the proposed state, as a necessary incident to the formation of a state government. The power to form a state government clearly implies the power to create and define every county within the limits of the new state, the only limitation upon the convention in this respect being that the Osage Indian Reservation shall remain a separate county until the lands in the Osage Indian Reservation are allotted in severalty, and until changed by the legislature of the state of Oklahoma.

Manifestly, the territorial government and all the counties organized thereunder were intended to be for temporary purposes only, and to remain as such until the state government was created and organized. It is difficult to perceive how the convention could have organized a *full* state government without defining and fixing the boundaries of the counties throughout the entire state. In this connection, it must be borne in mind that the convention was not created for the purpose of forming a government for Oklahoma or Indian Territory, but they were charged with the power, duty, and responsibility of forming a state government for all the people of the proposed state of Oklahoma, and in fixing the boundaries of the counties throughout the entire state, there were no limitations whatever placed upon the convention, except with reference to the Osage Indian Reservation, as above stated. Accordingly, the convention did, by the terms and provisions of the constitution, fix and define and name each of the counties of the proposed state, and designated the county seats therein,

and also provided how the county lines might be changed, or the county seats removed. The wisdom, expediency, or propriety, of such action is a question that was peculiarly confided to the convention, and is not the subject at this time of judicial cognizance.

That counties and townships are parts of a state government is so well settled by the adjudicated cases, that it is no longer open to serious judicial controversy.

In *Board of County Commissioners of Greer County v.; Watson,* 7 Oklahoma, 174, this court, speaking by Chief Justice Burford, defined a county as follows:

"A county is an involuntary political and civil division of the territory, created by statute to aid in the administration of governmental affairs, and possessed of a portion of the sovereignty. All the powers with which it is entrusted are the powers of the sovereignty which created it, and all the duties with which it is charged are the duties of the sovereignty."

In *Commissioners of Tolbert County v. Queen Anne's County,* 50 Md. 245, it is said:

"A county is one of the territorial divisions of the state created for public and political purposes connected with the administration of the state government."

This language was quoted with approval by the supreme court of the United States in *Washer v. Bullitt County,* 110 U. S. 562.

In *Commissioners of Laraminee County v. Commissioners of Albany County,* 92 U. S. 310, it was said by the supreme court of the United States:

"Corporations of the kind are properly denominated public corporations, for the reason that they are but parts

of the machinery employed to carry on the affairs of the state."

And in the course of the opinion, on page 311, Mr. Justice Clifford, speaking for the court, said:

"Institutions of this kind, whether called counties or towns, are the auxiliaries of the state in the important business of municipal rule, and cannot have the least pretention to sustain their privileges or their existence upon any thing like a contract between them and the legislature of the state, because there is not and cannot be any reciprocity of stipulation, and their objects and duties are utterly incompatible with every thing of the nature of compact. Instead of that, the constant practice is to divide large counties and towns, and to consolidate small ones, to meet the wishes of the residents, or to promote the public interests, as understood by those who control the action of the legislature. Opposition is sometimes manifested; but it is every where acknowledged that the legislature possesses the power to divide counties and towns at their pleasure, and to apportion the common property and the common burdens in such a manner as to them may seem reasonable and equitable. *School Society v. School Society,* 14 Conn. 469; *Bridge Co. v. East Hartford,* 16 *Id.* 172; *Hampshire v. Franklin* 16 Mass. 76; *North Hemstead v. Hemstead,* 2 Wend. 109; *Montpelier v. East Montpelier,* 29 Vt. 20; *Sill v. Conning,* 15 N. Y. 197; *People v. Draper,* *Id.* 549; *Waring v. Mayor,* 24 Ala. 701; *Mayor v. The State,* 15 Md. 376; *Ashby v. Wellington,* 8 Pick. 524; *Baptist So. v. Candia,* 2 N. H. 20; *Denton v. Jackson,* 2 Johns. Ch. 320."

In the case of *Eagle v. Beard,* 33 Ark. 497, it is said:

"The political power is composed of representatives from counties. Through them justice is administered, the revenue collected, and the local police rendered effective Neither the courts of justice, nor the executive of the state,

can perform any important function, except in the tribunals, or through the offices of the counties."

In *Woots v. Colfax.,* 10 *Neh.* 552, 7 *N. W.* 269; *Ch.* Justice Maxwell, quoting from 7 Mass., 169, says:

"A county is a mere local subdivision of the state created by it without the request or consent of the people residing therein. * * * County organization is created almost exclusively with a view to the policy of the state at large. * * * With scarcely an exception all the powers and functions of the county organization have a direct and exclusive reference to the general policy of the state, and are in fact but a branch of the general administration of that policy."

In *Commissioners of Hamilton County v. Mighels,* 7 Ohio St, 107, Justice Brinkerhoff says:

"Counties are legal subdivisions of the state, created by the sovereign power of the state, of its own sovereign will, without the particular solicitation, consent, or concurrent action of the people who inhabit them."

In *Ward v. County of Hartford,* 12 Conn. 406, Chief Justice Williams speaking of the court, says:

"The state is divided into counties for public purposes, and particularly for the more convenient administration of justice."

In *Gooch v. Gregory,* 65 N. C. 143, the court says:

"A county is a municipal corporation created by law for public and political purposes and constitutes part of the government of the state."

It follows that the convention had the undoubted right to define and fix the boundaries of every county in the proposed state, and to change existing counties, if they deemed it appropriate, and to define legislative and judicial districts,

in order that a full state government might be put into operation, and to provide for the necessary machinery to submit the constitution to a vote of the people for ratification or rejection.

THE CONVENTION MAY PROVIDE FOR THE ELECTION OF STATE, COUNTY, AND OTHER OFFICERS PROVIDED FOR IN THE CONSTITUTION.

By section 21 of the enabling act it is provided:

"That the constitutional convention may by ordinance provide for the election of officers for a full state government, including members of the legislature and five representatives to congress."

And by the last clause of section 6 of said act, it is provided:

"And the said representatives, together with governor and *other officers provided for in the said constitution,* shall be elected on the same day of the election for the ratification or rejection of the constitution; and until said officers are elected and qualified under the provisions of such constitution and the said state is admitted into the Union, the territorial officers of Oklahoma Territory shall continue to discharge the duties of their respective offices in said Territory."

It will thus be seen that congress granted the power and authority to the convention to provide by ordinance for the election of officers for a *full* state government. What, then, is a full state government within the meaning of this act? In our opinion. officers for a full state government includes not only the state officers whose power and duties are co-extensive with the limits of the state, .but includes all the officers whose duties are in any manner connected with the administration of the state government. Hence, we

think the convention had the power to provide in the ordinance for the election of all the officers which were provided for in the constitution, from the highest to the lowest. It seems to us to hold otherwise would be to place a very strained and narrow interpretation upon the language used in the act, that the convention may by ordinance provide for the election of officers for a full state government. And since we have already decided that the counties and townships are necessary and indispensable parts of the state government, it must follow, as an inevitable conclusion, that the convention had the power to provide for the election of state, county, and others officers provided for in the constitution.

### THE ORDINANCE.

What is an ordinance, and what are it objects? Section 4 of the enabling act provides:

"That in case a constitution and state government shall be formed in compliance with the provision of this act the convention forming the same shall provide by ordinance for submitting said constitution to the people of said proposed state for its ratification or rejection at an election to be held at a time fixed in said ordinance." etc.

It will thus be seen that the enabling act provides that the convention "Shall provide by ordinance for submitting said constitution to the people", etc. The language here used is clear, specific, and mandatory in its terms.

An ordinance, as used in this act, has the force and effect of a legislative enactment or law for the purposes therein named. Manifestly, it is a law which is essential to carrying into effect the objects for which the convention was created. Thus we speak of the famous ordinance of 1787, which

created a government of that portion of the territory of the United States northwest of the Ohio river, and known as the Northwest Territory.

It will thus be seen that congress conferred direct and express power and authority upon the convention to pass an appropriate ordinance to submit the constitution to the people for its ratification or rejection, at an election at a time fixed in said ordinance, by the convention. Such an ordinance, when once adopted by the convention, has the force and effect of statute law.

The distinction between a constitution and an ordinance is this : The constitution is a permanent fundamental law of the state. It is of a stable and permanent character. As is appropriately said in *Vanhorne v. Dorrence,* 2 Dall. 308;

"The constitution of a state is stable and permanent, not to be worked upon by 'the temper of the times. nor to rise and fall with the tide of events; notwithstanding the competition of opposing interests, and the violence of contending parties, it remains firm and immovable, as a mountain amidst the strife of storms, or a rock in the ocean amidst the raging of the waves."

But, under the terms of the enabling act, it is prospective in its operation only. That is, it does not become operative until it is ratified by the people, and approved by the President of the United States. On the other hand, an ordinance, as used in this act, refers to a merely temporary law, its object being to carry into effect the formation of the constitution and fundamental law of the state, to provide a mode and means for an election of a full state government, including the members of the legislature and five representa-

tives to congress, and because operative immediately upon its adoption.

Section 1 of the election ordinance adopted by the convention on April 22, 1907, provides as follows:

"Said election shall, in all respects, be held and conducted in the manner required by the law of the Territory of Oklahoma for elections therein, when not in conflict with the enabling act, and as supplemented by this ordinance, and the returns of said election shall be made to the secretary of the Territory of Oklahoma, who, with the chief justice thereof, and the senior judge of the United States court of appeals for the Indian Territory, shall canvass the same, and if a majority of the legal votes cast on that question shall be for the constitution, the governor of Oklahoma Territory, and the judge senior in service of the United States court of appeals for the Indian Territory shall certify the results to the President of the United States, together with a statement of the votes cast thereon, and upon separate articles or propositions, and a copy of said constitution, articles, propositions, and ordinances, and in all respects comply with the provisions of said enabling act."

And section 8 of said ordinance provides:

"That the election laws of the Territory of Oklahoma now in force, as far as applicable and not in conflict with the enabling act, including the penal laws of said territory relating to election and illegal voting, are hereby extended and put in force throughout the proposed state of Oklahoma until the legislature of said proposed state shall otherwise provide, and until all persons offending against said laws in the elections aforesaid, shall have been dealt with in the manner therein provided, and the courts of said state shall have power to enforce said laws in the same manner as other criminal laws of said state."

40--Vol. 18

It will thus be seen that the convention, in its ordinance, expressly put in force the election laws of Oklahoma, as far as applicable and not in conflict with the enabling act, including the penal laws of said territory relating to election and illegal voting, and expressly provides that the courts of said state shall have power to enforce said laws in the same manner as other criminal laws of said state, until all persons offending against said laws shall have been dealt with in the manner therein provided.

It seems to us that it was clearly the duty of the convention in its ordinance, to provide the necessary machinery for holding such election in all the newly created counties of the proposed state The officers created in the new counties in the Indian Territory and Oklahoma Territory were merely for the temporary purpose of providing the necessary election machinery to carry into effect the object of the convention. These offices are merely temporary, and they do not supersede or supplant any of the existing officers, who are charged with the power and duty under the election ordinance to carry into effect the duties devolving on them, and they possess and exercise no powers, except such as granted for the purpose of carrying into effect the provisions of the election ordinance. The manifest intention of the enabling act was that the convention should by ordinance make uniform and specific provisions  throughout  the proposed state for the holding of said election.

### IS THE CONSTITUTION REPUBLICAN IN FORM?

But one question remains, and that is: Is the proposed constitution republican in form?

Article 4 section 4 of the constitution of the United States provides that:

"The United States shall guarantee to every state in this Union a republican form of government."

And section 3 of the enabling act provides that:

"The constitution shall be republican in form, and make no distinction in civil or political rights on account of race or color and shall not be repugnant to the constitution of the United States and the principles of the Declaration of Independence."

This leads us to the inquiry: In whom is lodged the power and authority to decide when the government is republican in form?

In the case of *Luther v. Borden,* 7 How. 42, the supreme court of the United States, speaking by Chief Justice Taney says:

"The fourth section of the fourth article of the constitution of the United States provides that the United States shall guarantee to every state in the Union a republican form of government, and shall protect each of them against invasion; and on the application of the legislature or of the executive (when the legislature cannot be convened) against domestic violence.

"Under this article of the constitution it rests with congress to decide what government is the established one in a state. For as the United States guarantee to each state a republican government, congress must necessarily decide what government is established in the state before it can determine whether it is republican or not. And when the senators and representatives of a state are admitted into the councils of the Union, the authority of the government under which they are appointed, as well as its republican character is recognized by the proper constitutional authority. And its

decision is binding on every other department of the government, and could not be questioned in a judicial tribunal."

And in *Texas v. White*, 7 Wall. 730, the supreme court of the United States had occasion to reiterate this same doctrine, where it is said:

"But the power to carry into effect the clause of guaranty is primarily legislative power, and resides in congress, 'Under the fourth article of the constitution, and rests with congress to decide what government is the estabilished one in a state. For, as the United States guarantee to each state a republican government congress must necessarily decide what government is established in the state, before it can determine whether it is republican or not.' "

By section 4 of the enabling act it is provided:

"And if the constitution and government of said proposed state are republican in form, and if the provisions of this act have been complied with in the formation thereof, it shall be the duty of the President of the United States, within twenty days from the receipt of the certificate of the result of said election and the statement of the votes cast thereon and a copy of said constitution, articles, propositions, and ordinances to issue his proclamation announcing the result of said election; and thereupon the proposed state of Oklahoma shall be deemed admitted by congress into the Union, under and by virture of this act, on an equal footing with the original states."

It will thus be seen that the power to determine whether the constitution is republican in form is primarily a legislative power, and resides in congress; but this power was delegated by congress to the President, and this question is not the subject of judicial cognizance.

We therefore hold that the constitutional convention has the power and authority to submit to the people of the pro-

posed state of Oklahoma the provisions in the constitution providing for the creation of the counties of Alfalfa and Major of territory formerly embraced in Woods county, that under the terms of the enabling act, authorizing and directing the convention to provide by ordinance for an election to submit the constitution to a vote of the people for ratification or rejection, and for the election of officers for a full state government, the convention had the authority, to create the necessary election machinery in these counties, in order that the constitution might be submitted to a vote of the people, and that the ordinance providing for such election machinery in Alfalfa and Major counties is valid. It follows that the temporary injunction granted by the probate judge, restraining and enjoining the governor of Oklahoma, and the president and secretary of the constitutional convention from issuing or publishing any proclamation in which it is sought to submit to the electors of the proposed state of Oklahoma, as a part of said constitution, the creation of the counties of Alfalfa and Major, and which restrained and enjoined the officers provided for in the ordinance from exercising the powers and duties of the election officers in said counties was improvidently issued, and that the district court committed error in refusing to dissolve the injunction, and in overruling the demurrer to the petition, and in entering the decree making the temporary injunction perpetual.

### THE DECREE.

The judgment of the district court of Woods county is therefore reversed and in order that there may be no inconvenience or delay in carrying into effect the decree of this court is hereby ordered, considered, adjudged and

decreed that the judgment of the district court of Woods county be and. the same is hereby vacated, set aside, and held for naught; and it is further ordered, considered, adjudged and decreed that the injunction granted in said cause is hereby dissolved, vacated, set aside, and held for naught, and the said cause is hereby dismissed at the costs of the plaintiff.

Pancost, J. who presided in the court below, not sitting; Irwin, J. dessenting; Burwell, J., dissenting in part and concurring in part; all other Justices concurring.

Concurring opinion by

BURFORD. C. J.: While I concur in the conclusions reached and judgment announced in the opinion by Justice Hainer, I am unable to consent to some of the statements and reasons therein contained. In the decision of one of the cases involved in this general controversy in the district court of Logan county, I announced my views upon some of the questions involved in this cause, but after more comprehensive argument by able and industrious counsel and more careful research and extensive investigation I am compelled to modify my views somewhat as to the powers and character of the constitutional convention.

It is said in the opinion of the court and supported by the statements of some of the ablest text writers and jur-

ists, that "A constitutional convention is a legislative body of the highest order." In my judgment this proposition is incorrect, unsound and unsupported by reason or logic, and the statement is contradicted by the definition given by its authors of the powers and procedure of a constitutional convention. The constitutional convention is *sui generis*. In the American form of republican government, sovereignty rests in the people, and is exercised through representatives. In forming a constitution and state government the people act through their representatives in the convention, but they do not delegate all their legislative power to the convention. They reserve unto themselves the power of final approval or disapproval. The convention formulates, proposes, and submits proposals for the form of government and the fundamental laws; the people in their sovereign capacity enact these provisions into law. The convention has no power to enact laws; it possesses no legislative powers except such as may be necessary to exercise in prescribing by ordinance the methods and procedure for obtaining the expression of the electors upon the ratification or rejection of the proposed constitution, and for the election of the officers provided for in the constitution.

We have been taught by observation, experience and history to regard a legislative body as one having the power to enact laws, to legislate finally upon subjects within its sphere. A constitutional convention is not such a body. It is a representative, deliberative body, authorized by law; it derives its authority from congress, and exercises the power resting in the people. It is legislative in character; it proceeds in a legislative manner, acts in a legislative capacity in the

exercise of it powers in formulating and adopting proposi-
tions to be submitted for final action, but its powers to leg-
islate are of such limited and temporary character that
it cannot correctly be said to be a legislative body. In the
exercise of its powers it is supreme, and it is not within the
jurisdiction of any court to interfere with or to control it.
It is answerable only to the people whose trust it executes,
and they to the congress of the United States, which has the
power of final determination upon all questions relating to
the form of government and provisions contained in the con-
stitution.

If the convention has framed a government which is
not republican in form, has provided an apportionment which
violates that spirit of justice and fairness which pervades
the Declaration of Independence and constitution of the
United States, and denies to any portion of its territory or
people equal rights under the law, or has disregarded the
established principles of local self-government, then the ap-
peal must be to the electors in the first instance, and to the
President, to whom congress has delegated its power in the
premises, in the second instance. Such questions are poli-
tical and governmental and do not come within judicial cog-
nizance.

The election ordinance being in the nature of a tem-
porary law and now in force, is a subject-matter of judicial
cognizance. In the absence of any direction in the enabling
act I have no doubt but the convention possessed the inher-
ent power to by ordinance provide for the submission of the
constitution to the electors for their action, and for the elec-

tion of a full quota of state officers, but there is an express grant of power to that effect in the enabling act, and the question presented is: · Has the convention exceeded its powers in this particular, and usurped the powers of the election officers provided by and acting under the laws of Oklahoma? Conceding that the adoption of the election laws of Oklahoma by the enabling act carries with it the election machinery existing under such law, it must also be conceded that it is the duty of the convention to supply all defects in the operation of such machniery, and make the same, as supplemented by the convention, conserve the purposes of the entire proposed state. I find nothing in the election ordinance submitted by the pleadings in this case which in my judgment transgresses the powers of the convention, and upon this proposition I am in full accord with the opinion prepared by Mr. Justice Hainer.

Other questions have been argued in the several cases involving the questions here under consideration, but the determination of the court that the question of what subects may be by the convention proposed for approval or disapproval and their nature and extent is not one of judicial cogniznace, disposes of all questions relating to the contents of the proposed constitution.

Frantz *et al.* v. Autry.

Dissenting opinion by

BURWELL, J.: A majority of my brethren have declared what shall, for a time at least, be the law of this case. But as I entertain some views at variance with those expressed in the majority opinion, it is perhaps due the parties to the action, as well as the public (For all who live in either of the territories are interested in the result of this case) to know the reasons that have impelled me to withhold my full concurrence in the judgment of the court. In every controversy, personal or legal, there are two sides; but, in the very nature of things, on each issue one must be right and the other wrong, and while experience has shown that in the greater number of cases, perhaps the majority have been right, sometimes truth has been revealed to the few, and notwithstanding the respect I have for. the opinions of my brethren who have concurred in the decision of the court, my own convictions have told me that the law on one vital point is with the party who commenced this action, and that he is entitled to some relief.

The science of government is a profound subject which requires years of study and observation to master. In a republic nothing is as important as the constitution or organic law. Equally important is the organic law of a state. As to what should be in the constitution of Oklahoma to best protect the interests of her citizens, afford equal opportunities to earn a livelihood, and promote happiness, are questions which the constitutional convention must determine, subject to the approval of the voters of the proposed state; and this court cannot, with due regard to its powers, express thereon any opinion. But under the organic act of Oklahoma

which is and will remain in force until supplanted by a state constitution or repealed by congress, the supreme and district courts of the territory are granted jurisdiction and power to redress all wrongs committed against the constitution or laws of the United States, or of the territory, affecting persons or property. The constitutional convention was convened by authority of the United States, and where it is charged that they have exceeded their authority the courts may on proper application take jurisdiction, determine the issues, and render any righted judgment therein.

At the very threshold of this litigation the bold assertion is made that the convention has exceeded its powers and divided counties already organized in Oklahoma, and that it has provided for the election, not only of state officers including delegates to congress and members of the legislature, but also for the election of all officers, state, county and township.

In this country, with its diversified interests, with its people from all sections of the nation who have brought with them the policies and ideas of the lawmakers of their own state, with the struggle for personal and political supremacy, it would be indeed difficult to form a constitution that would satisfy all. Therefore, when counties are divided and new ones formed under conditions calculated perhaps to increase the taxation of the individual, I am not surprised that he should ask relief from the impending burdens. But whether the division of counties may increase or diminish the taxes of the citizen will not influence in any degree the judgment of this court, unless the convention

has exceeded its authority and usurped powers not necessarily implied or expressly conferred.

The only way in which the charge can be correctly decided is by investigating: First, the provisions of the enabling act, the constitution of the United States, and the Declaration of Independence; and second, ascertaining what powers a constitutional convention has incidental to the forming of a constitution; in other words, what are its implied powers.

It is to the enabling act that both parties point with apparent confidence as supporting the position taken, but after a careful study of this important congressional authority I am forced to the conclusion that both have in some particulars misapprehended the meaning of that act.

In the first place those who represent the convention assert that the making of counties and providing for their creation and organization are necessary to the framework of a state and therefore properly and necessarily the work of the convention, and that in establishing boundary lines in the Indian Territory, and in dividing the counties already established by congress in Oklahoma and creating new counties therefrom, the convention followed in the footprints of precedents; while the appellee contends that these acts were expressly forbidden by congress. In support of his position the appellee points to the fact that the counties in Oklahoma divided by the convention have been established by congress, and are organized and officered under the laws of Oklahoma, and that the latter part of section twenty-one of the enabling act provides:

"And all laws in force in the Territory of Oklahoma at the time of the admission of said state into the Union shall be in force throughout said state except as modified or changed by this act or by the constitution of the state, and the laws of the United States not locally inapplicable shall have the same force and effect within said state as elsewhere within the United States."

Surely no lawyer will contend that the provisions of the constitution can become effective until Oklahoma is formally admitted into the Union. Until that time its penalties cannot be enforced; its guarantees cannot protect the citizen in the enjoyment of life, liberty or property. The convention is acting for the future state, and not for the territories. It cannot divide the counties of the Territory of Oklahoma, but it may declare not only how many counties may be created, but also what territory shall form the counties of the state; and that part of section twenty-one of the enabling act which provides that the laws of Oklahoma shall be in force throughout the state except as modified by the constitution, etc., of the state, made clear the intention of the lawmakers. "Except as modified by the constitution of the state." is the language of congress, and the instrument proposed to be submitted to the people for ratification is not yet a constitution; in fact it may never be. The voters must first adopt it, and then it must be approved by the President before life is breathed into it. Its terms do not become operative by degrees. It is and will be void of life until the President issues his proclamation. When this· is done the entire constitution, each and all of its provisions *eo instante* spring into life, and from that time on it becomes the ruling power of the state. Until then the offices created by it do

not exist.    The powers conferred and limitations imposed therein have no binding force, and the counties. described in the constitution are but a part of the written specifications of the architects who have drawn the plans for statehood. And as the architect may propose plans for the building, even so may these agents of the people employed by the government, propose plans for the building of the state.    Congress has placed certain restrictions in the enabling act.    The constitution of the United States contains other rules that must be followed; likewise due regard must be observed for the principles of the Declaration of Independence; but subject to these limitations, the power exists to put into the constitution or leave out of it that which the judgment of the convention and the people may approve or reject.

The contention, therefore, that the convention cannot legislate under the views herein expressed, must be determined if at all, as a controversy presenting a subject void of real merit, so far as legal rights are concerned, because such provisions have no force until the state is admitted into the Union, and after that they are binding on all. Whether the making of counties is a proper subject for the constitution to deal with, or should be referred to the legislative branch of the state government, it is unnecessary to decide. Personally, however, (And I am speaking only for myself) I have no doubt but that the making of counties by the convention or by the legislature is a matter of judgment, and involves no question of power unless the constitution    as adopted inhibits the legislature from dealing with that subject.    But be this as it may, the action of the convention in dividing the counties in question, is an act which does not

affect the territorial government, but the government of the state, and if the people are entitled to self government,—that is adopt a state constitution and code of laws,—they and their representatives should be left free to evolve their own system and form a state government to their own liking, within the limitations stated.

If it were necessary to support these views by precedents, no difficulty would be experienced in finding them, and I may refer to some of the adjudicated cases later; but before considering them I wish to assert that congress instead of prohibiting the convention from fixing county boundaries, and creating new counties for the future state have expressly recognized the right of the convention to do so. Now as has been urged by appellee, these counties were created by congress and officered under the provisions of the territorial laws. Did congress in the enabling act provide that the laws of the United States and the laws of Oklahoma should continue in force in the state of Oklahoma? Oh. no. It did, however, attempt to carry along a complete system of laws and continue the territorial officers in power until supplanted by laws enacted by the state and officers elected by its voters, or duly appointed as the constitution or laws might provide. The general government provided against contingencies which otherwise might have left the citizen and property exposed to the dangers incident to lack of law. Therefore the enabling act provided that "All laws in force in the Territory of Oklahoma at the time of the admission of said state into the Union shall be in force throughout said state, *except as modified or changed by this act or by the constitution of the state."*

What laws shall govern the state when first admitted? The laws of Oklahoma. The laws of Oklahoma as they now exist? No, but the laws of Oklahoma as modified or changed by the enabling act, and the constitution of the state. This language clearly not only confers the right, but anticipates that changes in those laws may be deemed expedient. Let us now notice what is· to become of the laws of the United States other than the enabling act. Congress has said in this same section of the enabling act and as a part of the section referred to above. Let us observe the clause again. "All laws in force in the Territory of Oklahoma at the time of the admission of said state into the Union shall be in force throughout said state, except as modified or changed by this act or by the constitution of the state *and the laws of the United States not locally inapplicable shall have the same force and effect within said state as elsewhere within the United States.*"

It will be observed that congress did not continue in force generally the laws of the United States applicable to Oklahoma and Indian Territory, nor does congress say that the laws of Oklahoma shall be in force in the state of Oklahoma, except as modified by the enabling act and the constitution of the state and the laws of congress. The exception refers to the enabling act and the constitution of the state, and then in a subsequent clause, but connected with that which precedes it, congress said, not as an exception, but as a positive declaration, "And all the laws of the United States not locally inapplicable shall have the same force and effect within said state as elsewhere within the United States."

From this provision it is evident that congress intended that the laws of the United States enacted for the organization and government of these territories should not continue in force, and that those laws which deal with subjects that would be a proper subject of congressional legislation in a state, and those only, are continued in force, and even those are to have the same force and effect within said state as elsewhere within the United States.

This act is a complete surrender of governmental control over these territories, upon a compliance with its terms and conditions, except that control exercised over the other states of the Union; and this is in keeping with the law applicable to such conditions as declared in the books.

In 8th Cyc. page 750, subdivision e, I find the following language:

"Upon the succession of a territory to statehood and the adoption of a constitution by its people that has received the approval of congress, all constitutions and ordinances framed by the federal authorities for the purpose of the territorial government become suspended, giving full force and effect to the new state constitution so adopted."

Attention is also called to section thirteen of the enabling act which contains the following language:

"And that the laws in force in the Territory of Oklahoma, as far as applicable, shall extend over and apply to said state until changed by the legislature thereof."

The trial court quotes this language as an inhibition against the power of the convention to create counties in Oklahoma for the state government, or to provide for the election or appointment of county officers for the same. As the justice who tried this case below is a member of this

41—Vol. 18

court and by reason of having presided at such trial will not participate in its consideration here, it is probably due his position that reasons by him assigned for his judgment be answered by the justices called upon to review. This I gladly do, in so far as they conflict with my own opinions, consistent with the space which may reasonably be taken in an opinion of this kind. The trial court following up the language last quoted by way of argument for his position states as follows:

"It should be borne in mind also that ·Woods county owes her existence to the same power and authority from which the existence of the convention is derived. The same power which created the convention, years before created this county. The law by which this county was created is still in force. The act providing for the formation of a state government, neither by express or implied terms, repeals the act under which this county (Woods county) was formed. How can it then be said that the congress of the United States gave to the constitutional convention the implied power to divide any county? There is no express provision therefor in the act. There is no necessity for so doing. No better government will be formed thereby. No interests will be better protected. Large and various individual interests have been established and great confusion would exist by such division."

And again, the trial court referring to the clause quoted from section thirteen of the enabling act says:

"It will be borne in mind that this provision of the enabling act does not provide that the laws of the territory extend over the state only as far as applicable. But the laws of the territory are in operation when the constitutional convention is formed and remain in operation while the constitutional convention is in session. They remain in full

force and operation after the constitutional convention is adjourned. Nay, still more, they remain in full force and operation so far as applicable in the whole state after the state government has been formed and until the state legislature changes the same.   This is a conclusive answer to some of the questions contended for."

From a casual reading of the clause of the enabling act referred to, and the language of Mr. Justice Pancoast in deciding the cases below, the mind might readily assent to the views above expresssed by him; but having started from a false premise,—that is from a misconception of the meaning of the statute quoted, and possibly being inclined to the theory adopted in declaring the law, an erroneous conclussion was reached, as I am sure must be conceded upon full consideration of all the section of the enabling act from which the "clause" was taken. However before proceeding to further inquiry regarding this section, and without elaborating thereon, I wish to refer to the language used by the trial court, and must insist that the courts cannot supervise or review the acts of the convention which pertain to necessity or policy so long as it does not exceed its power and even then the courts will only grant relief in certain circumstances.   Congress has authorized the convention to prepare a constitution, and it is not for the courts to say that there is no necessity for dividing counties, or that no better government can be formed thereby, or that no interest will be better protected.   Within the powers conferred or implied the convention may submit to the people its own ideas without let or hinderance.

The language used in section thirteen of the enabling act to the effect that the "Law in force in the Territory of

Oklahoma, as far as applicable, shall extend over and apply to said state until changed by the legislature thereof," has no reference to the general laws of Oklahoma as they exist at the present time, or as they shall exist after statehood is effected. The part of the enabling act which continues in force the general laws of Oklahoma after the organization of the state is the latter part of section twenty-one which I have already considered, and expressly says that the laws of Oklahoma shall be in force through the state, *except* as modified or changed by the enabling act, or the constitution of the state. The language used in this section is positive, and from its provisions the courts of the state can determine and declare what the law is. Not so with section thirteen. The language of this section is as follows: "And that the laws in force in the Territory of Oklahoma, *as far as applicable,* shall extend over and apply to said state until changed by the legislature thereof."

The laws of Oklahoma, *as far as applicable,* shall extend over and apply to the state. Who shall determine what laws are applicable to the state? If this clause of section thirteen is given the interpretation placed upon it by the trial court, and as contended for by counsel for appellee, then it is in conflict with section twenty-one, which says that the laws of Oklahoma shall be in force throughout the state *except* as *modified* or changed by the *enabling act* or the *constitution of the state.* Such an interpretation would reflect upon the intelligence of congress, and attribute to both branches of that body a carelessness in the use of language which I am not willing to concede.

It is impossible to cut out a subordinate clause of a single sentence, disconnect it not only from the sentence of which it forms a part, but from the entire subject in relation to which it was used, and determine exactly what the speaker or writer had in mind, and the meaning intended to be conveyed. Therefore, in construing this language relied upon as prohibiting this constitutional convention from doing any act which may conflict with existing law, I insist that it be read in connection with the whole of section thirteen. When so read its meaning is incapable of misunderstanding.

Section thirteen deals with one subject, and with one subject alone. It divides the state of Oklahoma into two judicial districts, designating the Indian Territory as the eastern district and Oklahoma as the western. It provides the places where the circuit courts shall be held in these respective districts. It attaches these districts to the eighth judicial circuit. It provides for the appointment of clerks of courts, and other court officers, and defines their respective duties. It declares that the circuit and district courts for each of said districts, and the judges thereof, respectively, shall possess the same power and jurisdiction, and perform the same duties required to be performed by the other circuit and district courts and judges of the United States, and shall be *governed* by the same *laws and regulations;* that the marshal, district attorney, clerk of each of the circuit and district courts of said districts, and all other officers and persons performing duties in the administration of justice therein, shall severally possess the powers and perform the duties lawfully required to be performed by similar officers

in other districts of the United States, and shall, for the services they may perform, receive the fees and compensation now allowed by law to officers performing similar services for the United States in other districts of the United States; and then follows the clause relied upon by the appellee, "And that the laws in force in the Territory of Oklahoma as *far as applicable,* shall extend over and apply to said state until changed by the legislature thereof."

Congress, when it used the language just quoted, was dealing with the courts of the United States. It had just defined their jurisdiction and provided for all of those other officers necessary to the administration of those courts, and by this clause a system of procedure was adopted for the government of the United States circuit courts, until the present procedure of Oklahoma should be changed by the legislature of the state. Congress had reason to believe that the general laws of Oklahoma would be changed by the constitution of the state, and it was familiar with the enabling act which it was then considering, and of which these provisions are a part. The enabling act did not, and congress in the light of all precedents could hardly anticipate that the constitutional convention would deal with mere matters of procedure in the courts; however, the unexpected occurred, at least in one instance; but the fact that the convention changed the generally accepted procedure in indirect contempt cases, in no way changes my mind as to what congress anticipated, meant and intended by this latter part of section thirteen. The United States, having no uniform procedure for its courts, has deemed it expedient to put in force in the courts of the United States the procedure of the res-

pective states in which such courts are located; and, to comply with this usual custom, the laws of Oklahoma, *as far as applicable,* are extended over and made to apply to the state.

Section 914 of the Revised Statutes of the United States 2nd. ed. 1878, provides:

"The practice, pleading, and forms and modes of proceeding in civil causes, other than equity and  admiralty causes, in the circuit and district courts, shall conform as near as may be to the practice, pleading and forms and modes of proceeding existing at the time in like causes in the courts of record of the state within which such circuit or district courts are held, any rule of court to the contrary notwithstanding."

I also quote the following section from the United States Statutes, referred to above:

Sec. 915: "In common law causes in the circuit and district courts the plaintiff shall be entitled to similar remedies, by attachment or other process, against the property of the defendant, which are now provided by the laws of the state in which such court is held for the courts thereof; and such circuit and district courts may, from time to time, by general rules, adopt such state laws as may be enforced in the states where they are held in relation to attachments and other process:  Provided, that similar preliminary affidavits or proofs, and similar security, as required by such state laws, shall be first furnished by the parties seeking such attachment or other remedy."

Sec. 916: "The party recovering a judgment in any common law cause in any circuit or district court, shall be entitled to similar remedies upon the same, by execution or otherwise, to reach the property of the judgment debtor, as are now provided in like causes by the laws of the state in which such court is held, or by any such laws hereafter en-

acted which may be adopted by general rules of such circuit or district courts; and such courts may, from time to time, by general rules, adopt such state laws as may hereafter be enforced in such state in relation to remedies upon judgments, as aforesaid, by execution or otherwise."

Sec. 856: "The fees of district attorneys, clerks, marshals, and commissioners, in cases where the United States are liable to pay the same shall be paid on settling their accounts at the treasury."

Sec. 857: "The fees and compensation of the officers and persons hereinbefore mentioned, except those which are directed to be paid out of the treasury, shall be recovered in like manner as the fees of the officers of the states respectively for like services are recovered."

From these and other sections of the United States Statutes and the connection in which the language under consideration was used, it is clear that congress was dealing with the laws of Oklahoma in section thirteen of the enabling act only in so far as they might furnish a rule of procedure or be binding upon the courts of the United States located within the state of Oklahoma. And it is for the courts of the United States to say how far these laws are applicable in matters pertaining to persons and property which may come before them. Section thirteen, like the constitution of the state, has no life and force until the President issues his proclamation, there being no circuit or district courts of the United States established within the purview of the act in either of these territories, and doubtless will not be until we are granted statehood. I have considered that part of section twenty-one of the enabling act which refers to the Osage Indian Reservation, and requires that it constitute a separate

county. The language used in reference to this matter, while a limitation on the convention, in that it prevented it from making more than one county out of the reservation, not only recognized the right of the convention to deal with the subject of counties but in this particular instance required it to do so.

Being of the opinion that the convention has the right to divide the proposed state into counties, we are confronted with the question of the election of county officers to administer the affairs of such counties upon the admission of the state into the Union. The right to do so at the election at which the constitution is to be voted upon is vigorously asserted on the one side, and strenuously denied on the other. In this, as in the other questions involved in the case, no useful purpose can be observed by long quotations from other decisions which in the very nature of things can have but little bearing upon the interpretation of the enabling act.

As will be seen from investigation, different courses have been pursued by different states, under practically the same conditions. I have examined the decisions cited by counsel on the respective sides and believe I understand what those courts have decided, as well as the contention of the attorneys; but, with due respect to all concerned, I am compelled under the law to approve that theory or interpretation of these laws which appeals to my own reason, and reject those which my conception of the application of legal principles suggest that I exclude. Therefore, believing that a careful study of the enabling act itself will be most likely to lead to a correct understanding of its provisions, I turn to it and find therein sufficient to inspire confidence in the

conclusion that county officers˙ may be elected at this first election.

In section four of the enabling act it is provided:

"That in case a *constitution* and *state government shall* be formed etc., the convention shall provide by ordinance for submitting it to the people."

Then section six, after dividing the state into congressional districts, ends with the paragraph, "And the said representatives, together with the governor and other officers provided for in said constitution, shall be elected on the same day of the election for the ratification or rejection of the constitution; and until said officers are elected and qualified under the provisions of such constitution and the said state is admitted into the Union, the territorial officers of Oklahoma Territory shall continue to discharge the duties of their respective offices in said territory."

I cannot conceive of language that would more clearly express authority to elect county officers, if the constitution provides for county officers. Is there anything in the enabling act that limits the constitution as to the kind, character number or dignity of the officers which it may provide for in the constitution, except as to governor, secretary of state and members of the legislature? Not being limited by the enabling act, the convention, in forming a state government, not only has the right, but it was its duty to provide in the constitution for state officers, county officers (For county organization has come to be regarded as necessary in administering the affairs of a state) and such other officers as would be required for the convenience of the public and the administration of the law. The constitution having provided for

specific officers, congress has plainly said, in the section referred to that "The *governor* and *other officers provided for in the constitution shall* be *elected* on the *same day* of the *election* for the *ratification* or *rejection* of the *constitution*."

Turning to section one and two of article seventeen of the proposed constitution I find the following provisions:

"Section 1. Each county in this state, now or hereafter organized, shall be a body politic and corporate. -

"Section 2. There are hereby created, subject to change by the legislature, in and for each organized county of this state, the offices of judge of the county court, county attorney, clerk of the district court, county clerk, sheriff, county treasurer, register of deeds, county surveyor, superintendent of public instruction, three county commissioners, and such municipal township officers as are now provided for under the laws of the Territory of Oklahoma, except as in this constitution provided."

These officers are provided in the constitution, and congress has commanded that they "Shall be elected on the same day of the election for the ratification or rejection of the constitution;" and if the people failed to elect all of the officers provided for in the constitution they would, to the extent of such omission, fail to comply with the act of congress.

But it is said that the latter part of this same section authorized the territorial officers to continue in office in the state until their successors are elected and qualified under the state laws and that the language used amounts to a prohibition of election for such officers when the constitution is adopted. This conception is not only erroneous, but no reasonable ground exists for such an interpretation. Congress

did not intend to impose the officers selected, either by appointment or election under the laws of the United States or under its supervision, upon the people of the state who, after the admission of the state, would have a right to make their own selection. It not only did not intend to do so, but it probably would not have the power to do so. When Oklahoma becomes a state (Not after the first election after the adoption of the constitution, but from the very instant the President issues his proclamation) it has the undisturbed right to administer its own internal affairs, and dictate its own officers. Congress has clearly recognized these rights of the future state; but it is necessary to read the entire paragraph together: "And said representatives, together with the governor and other officers provided for in said constitution, shall be elected on the same day of the election for the ratification or the rejection of the constitution; and until said officers are elected and qualified under the provisions of such constitution, and the said state is admitted into the Union, the territorial officers of Oklahoma Territory shall continue to discharge the duties of their respective offices *in said territory.*"

Now let us consider this language for a moment. First, the officers provided for in the constitution must be elected on the same day of the election for the ratification or rejection of the constitution: Second, until these state officers are elected and qualified, and the state admitted in to the Union, the territorial officers shall continue to discharge the duties of their respective offices *in said territory.* Congress by the provisions of the section under consideration, contemplated a complete surrender and turning over to the state and

its officers every thing to which it or they would be entitled as a state fully admitted and standing on the same footing as the other states. These observations, however, I perceive will not satisfy the appellee or his counsel, as one other section of the enabling act which pertains to state officers has not been considered. I refer to section twenty-one, which, so far as effects this subject, provides as follows:

"Sec. 21. That the constitutional convention may by ordinance provide for the election of officers for a full state government, including members of the legislature and five representatives to congress, and shall constitute the Osage Indian Reservation a separate county, and provide that it shall remain a separate county until the lands in the Osage Indian Reservation are allotted in severalty and until changed by the legislature of Oklahoma, etc. * * * and shall provide rules and regulations and define the manner of conducting the first election for officers in said county. Such state government shall remain in abeyance until the state shall be admitted into the Union and the election for state officers held, as provided for in this act."

The section then provides for the election of senators, etc., and then adds, "And the officers of the state government formed in the pursuance of said constitution, as provided for by said constitutional convention, shall proceed to exercise all the functions of such state officers."

There is no conflict between this section and section six which I have just considered. While section six expressly provides that all officers provided for in the constitution shall be elected when the constitution is voted on, it must be remembered that, while the convention can create an office by the terms of the constitution, as said before, the constitution

has no binding force until the state is admitted into the Union; therefore congress conferred upon the constitutional convention the powers to provide for the election of these officers by ordinance. And an ordinance passed pursuant to the terms of this section, by the representatives of the people of the proposed state in convention duly assembled, within the limitations imposed, has from its passage, for the purposes intended, full life, force and virtue.

Mr. Jameson, in his work on Constitutional Conventions, (4th ed.) page 98, c. 103 says:

"Besides schedules, there are appended to many constitutional acts adopted by constitutions called ordinances. Not all ordinances. however, are so appended, or have any direct relation to the constitution. They are in their nature resolutions of the bodies adopting them, but taking the name, ordinances, to distinguish them from the similar acts of legislative bodies, denominated resolutions, which may be adopted by houses severally or jointly. Within the scope of the powers of the convention, ordinances may be valid and effectual according to their terms and purpose. If they are employed to provide for temporary emergencies of the convention, and do not transcend the limits of its powers as defined or employed in the act calling it, they are valid."

The ordinance referred to is authorized by congress, and is the act of the people of the proposed state, through their representatives, and is binding upon the people of the state, hence, the state. This ordinance is the authority for the election. But for what must the ordinance provide? The enabling act says: "For the election of officers for a *full state government,*" and the officers necessary for a full state government are all the officers provided for in the constitution. The word

"full" is defined as, "Containing or having all that can or all that should be admitted; having no empty or vacant space; filled." And this is the sense in which the word was used in section twenty-one. There should not be left out a single officer high or low. Each and all provided for in the constitution should be elected when the constitution is submitted to the people.

But, says the appellee, the section also provides that, "Said state government shall remain in abeyance until the state shall be admitted into the Union, and the election for the state officers held as provided for in this act." The only election for state officers provided for in this act (The enabling act) is the election at which the constitution shall be submitted for ratification or rejection. Therefore the language, "Until the state is admitted into the Union, and the election for state officers held," must be interpreted as describing two events which are expected to happen in the future, and the one intended to occur second in point of time, first described. Any other interpretation of this language would defer the election of all state officers until after the adoption of the constitution, which would be in direct conflict with another section of the enabling act. The fallacy of the contention that county officers are not to be elected when the constitution is voted upon, to my mind, is so apparent that under all of the provisions of the enabling act, it would seem that further discussion is unnecessary.

First, after the assembling of the constitutional convention and complying with the preliminary requirements of the enabling act, is the duty of forming a constitution and state government: Next, the submission of the constitution to

the people for ratification or rejection, and on the same day the election of all officers provided for in the constitution: Then the action of the President approving, if it conforms to the act of congress, and the issuing of his proclamation admitting the state into the Union; and, finally in the language of the latter part of section twenty-one of the enabling act, "And the officers of the state government formed in pursuance of said constitution, as provided by said constitutional convention, shall proceed to exercise all the functions of such state officers."

This brings us to a consideration of the powers of the constitutional convention to provide election officers to hold the election in the new counties of Alfalfa and Major. These counties were created out of a portion of the county of Woods and to that part of Woods county remaining was added certain townships cut off from Woodward county and the name Woods county given to it. Both Woods county and Woodward county are organized counties in the Territory of Oklahoma. In considering this feature of this case, the facts that Alfalfa and Major counties are located within Oklahoma Territory, and that they are merely creatures of the constitutional convention, and never had any legal existence prior to its convening, should be borne in mind. A majority of my brethren, speaking through Mr. Justice Hainer, have defined their position upon this point, declaring as a law a rule which is, in my opinion, neither justified from the necessities of the case or supported by the enabling act or other statutes of congress or the Territory of Oklahoma. Gladly would I surrender any pride of opinion which I may have in my own personal views of the law of this branch of the controversy, if I were able to

reconcile the declarations of the majority opinion with the plain and positive act of congress; but, after full consideration, I am forced to reject them as unwarranted approval of an unauthorized usurpation of authority which is by implication as positively prohibited by congress as though it had so declared in express words.

I fully appreciate the years of earnest effort expended by the people of Oklahoma in obtaining permission from congress to adopt a constitution, and form a state government, nor am I unmindful of the public insistence for an opportunity to elect their own officers and have their interests represented in congress by agents with full authority to vote. But important and sacred as are these privileges, they must be brought about pursuant to existing laws, and not in disregard thereof. I do not challenge good faith on the part of the convention or those who drafted the ordinance in question, but taking it as written I consider its provisions not as a matter of choice, but as a public duty required to be performed under the law. A majority of my brethern have said, by their votes, that the election ordinance is within the authority conferred by the enabling act. Coming from the highest court of the territory, the decision will doubtless inspire confidence, in the members of the convention and the people generally, regarding the authority to enact the same. But with a full realization of the consequences which may follow upon the pursuance of a course in holding these elections in conflict with the provisions of the enabling act, and entertaining views in conflict with the judgment of the majority of the court, my own conception of justice compels me to at least declare those views, even though they have been rejected by

my brethern as not the law, and may be disregarded by the patries to the action.

In section 3 of the election ordinance adopted by the constitutional convention, it is provided: "In the counties of Adair, Alfalfa." (Then naming other counties, including Major.) " The local officers and authorities provided for in the ordinance, shall exercise all the functions and perform all the duties within the limits of such counties, townships and voting precincts in the same manner as is now required by the laws of the Territory of Oklahoma for election thereon." In connection with section 3 we will refer briefly to certain of the other provisions found in the ordinance. Section two declares that the election of the officers shall be held in accordance with the election law of the Territory of Oklahoma when not in conflict with the enabling act and as supplemented by the ordinance; that in the counties of Beaver, Caddo, Comanche, Greer, Payne, Roger Mills, and Woodward, the local authorities in said respective counties, and the voting precincts therein shall exercise their functions and perform their duties as such election officers only within the limits of said counties as defined and described in the constitution; that in the county of Noble the local authorities, in the exercise of their functions and the performance of their duties as election officers, shall exercise and extend the same to the limits of said county as defined in the constitution. Section six provides that in each of the counties of Greer, Beaver, Woods, Woodward, and Comanche (and any other county in the proposed state similarly situated) as defined and described in this constitution, on or before the sixth day of June, A. D. nineteen hundred and seven, the acting board of county

commissioners therein or a majority thereof, shall subdivide such county or counties into commissioners' districts and townships, and fix election precincts, and designate polling places, necessary for the purpose of the election. And then the section provides that if the commissioners fail to comply with the provisions of the section by a date named, then William H. Murray, as president of the convention, shall appoint three qualified electors in each of the counties to divide such counties into commissioners' districts and townships, and fix election precincts, and designate polling places. Other sections provide that in the event of vacancies in certain county offices they shall be filled by appointment by the governor; and in the event that he fails or refuses to make such appointment or appointments, they shall be made by William H. Murray, president of the convention.

All of these provisions were enacted under the alleged power granted by congress authorizing the constitutional convention to provide by ordinance for the election of officers for a full state government, and for submitting the constitution to the people of the proposed state for ratification or rejection .

I shall not stop at this time to quote the law of Oklahoma pertaining to elections, or the manner in which the officers of the territory, from the highest to the lowest, are appointed or elected. It is sufficient to state, as is universally known, that Oklahoma was organized as a territory in 1890. Since then it has had an election law, which, with the modifications and changes made from time to time by the territorial legislature, is as complete and satisfactory as will be found in any state. Congress but a short time ago had occasion to ex-

amine the provisions, by reason of a contest before that body over the election of a territorial delegate. Anticipating these very elections as a necessary step in securing statehood, it is fair to assume that the members of the lower house, as well as the senators, familiarized themselves with our entire law and system of elections. Its provisions having appealed to them as fair and sufficient, as a part of the enabling act it positively declared, "That the election law of the Territory of Oklahoma now in force, as far as applicable and not in conflict with this act, including the penal laws of said Territory of Oklahoma relating to elections and illegal voting, are hereby extended to and put in force in said territory until the legislature of said proposed state shall otherwise provide, and until all persons offending against said laws in the election aforesaid shall have been dealt with in the manner therein provided." This language authorizes no change or modification, by the constitutional convention, of the election laws of the Territory of Oklahoma, in so far as their application, within Oklahoma Territory, is concerned. The words "As far as applicable and not inconsistent with this act" refer to the application of the election laws in the Indian Territory. Taking into consideration the plain implication of the language used, the quotation above means that the elections laws of the Territory of Oklahoma, now in force, shall continue in force in Oklahoma Territory until the legislature of the proposed state shall change them, and that these same election laws of the Territory of Oklahoma, as far as applicable and not inconsistent with this act (the enabling act) are hereby extended to and put in force in said Indian Territory until the legislature of said proposed state shall otherwise provide.

Congress was familiar with the conditions in Oklahoma, and declared that for the purposes of these elections they should continue. Congress considered these laws applicable and fully adapted to meet the conditions. No exception was made as to the Territory of Oklahoma, save in one instance which I shall notice later. The continuing in force of these election laws of Oklahoma within this territory, not only continued the laws themselves but also continued all the machinery and officers of every kind and character provided for in these laws of Oklahoma, except as those laws might possibly be in conflict with the enabling act. This view is so fundamental that reasoning to support it appears unnecessary. However, I find the rule very closely stated by Chief Justice Burford in a decision by him announced in one of these election cases, wherein he presided in the trial court. *Haines et al., v. Murray et al.,* and other cases, in the district court of Logan county. The Chief Justice, referring to the language above, said: "I think it cannot be seriously questioned that in adopting the (election) laws of Oklahoma that they adopted with them whatever machinery existed under that law. The law creates certain officers, election officers, etc."

The exception to which I referred a moment ago, with reference to the election laws of Oklahoma, is that part of section 21 of the enabling act, which provides, "That the constitutional convention may by ordinance provide for the election of officers for a full state government, * * * and shall constitute the Osage Indian Reservation a separate county * * and shall provide rules and regulations and define the manner of conducting the first election for officers in said county." It will be observed from the language that even in this Indian

reservation, congress having declared that the election laws of Oklahoma shall continue in force therein, limited the constitutional convention in providing " *Rules* and *regulations* and *defining* the *manner* of *conducting* the first *election*" for officers. As to what congress meant by the language "Rules and regulations and define the manner of conducting the first election" I shall not here express any opinion; but this language used with reference to this unorganized reservation must be limited to it alone, and neither it or any other language used in the enabling act can be construed to mean a grant of authority for removing public officers elected by the people, or appointed by the proper authority. I have said heretofore that the constitutional convention has the right and power to divide the future state into counties, even though such division may not conform to the county lines as now established in the Territory of Oklahoma, and that it also has the right to elect a full complement of officers for each county at the election for the ratification or rejection of the constitution; and I have also tried to make it plain that these proposed counties can have no existence, in law, and cannot be recognized as political sub-divisions of the state, having a present existence so as to oust the officers duly elected or appointed, under the laws of the Territory of Oklahoma, from the discharge of any duty imposed by those laws; for not only are the election laws of Oklahoma continued in force until changed by the legislature of the future state, but the enabling act itself in positive terms provides. "That until said state is admitted into the Union, the territorial officers of Oklahoma Territory shall continue to discharge the duties of their respective offices in said territory."

These counties proposed by the constitutional convention whose boundaries are fixed by the constitution to be submitted to the people, are simply counties in future, and the officers provided for in the constitution can exercise no official duty until after the admission of the state. The election at which the constitution is to be submitted for ratification or rejection, and at which there shall be elected officers for a full state government. is to be, under the terms of the enabling act, conducted in the usual way under the laws of the Territory of Oklahoma. And the constitutional convention cannot confer upon these election officers any powers which they do not now enjoy, or take from them any they now possess. Nor can the convention limit the exercise of the powers of these county officers within a proposed county composed of less territory than that for which they were elected, or extend their jurisdiction beyond the lines of the county as now organized, in which their duties under the territorial laws are to be discharged, and for which they were chosen.

It is argued, and with some force, that the election laws of the Territory of Oklahoma, as they now exist, are not exactly applicable to the conditions in the new counties, as they are proposed to be organized in the state. This may be. And it is possible that the convention, as a necessary incident to electing the officers in these new counties, may have to provide by ordinance to meet the conditions there existing; but whatever ordinance is passed by the convention, it must be in aid of the law as it now exists. and not in conflict therewith or destructive thereof. Nor has the convention the power to take away from the present election officers in Oklahoma the right to hold these elections, and confer the power to perform

their duties on others. The fact that the forming of new
counties may present some embarrassment in the holding
of the election is a matter of regret, but it is no excuse or
justification for ignoring the law. Whatever difficulties are
presented by the reason of the forming of these new counties,
are the results of the acts of the convention itself, and for
which congress is in no way responsible.   The convention
should seek for plans under which it may submit its proposi-
tions to the voters under the laws as they exist, and not to make
the laws conform to the conditions which it is sought to bring
about as a result of the   election.     Congress authorized   the
forming of a constitution.   It not only authorized the election
of the state officers, but required them to be elected at the
election at which the constitution is submitted to the people.
It, within certain limitations, has left the convention free to
make the kind of a constitution it might desire, and to create
as few or as many offices as it might deem expedient, but has in
effect named the officers of the territory as the agents to dis-
charge this important duty, and made the laws of the terri-
tory the rule of conduct.

The election officers of Woods county, as now organized
under the territoral laws, should conduct the election within
that county, in that part composing Alfalfa county, and in
that part composing Major county, as well as that portion
which in the future state will constitute a part of Woods coun-
ty. Their jurisdiction is in the whole of Woods county as now
organized, and no more.   These men are still in office.   They
have not been removed. Nor has their county yet been changed.
Should statehood fail the county organization will continue
under the   territorial government as before.   By virtue

of what right can the jurisdiction of these officers, in such a contingency, be temporarily suspended except. as to a small part of the county, and then restored if the constitution should not carry? And again, why should the convention confine the jurisdiction of these county election officers to that part of Woods county, Oklahoma, that will form a part of Woods county in the state, without regard to whether the officer lives in that part that will be Alfalfa, Major or Woods? Counsel should not forget that these election officers are holding these elections under the provisions of the enabling act as officers of the Territory of Oklahoma, for the people of this territory, bound by the oaths prescribed by its laws. And if the convention can remove the county election officers from a part of a county as now organized, it can remove them from exercising any act in connection with the holding of the election in any part of the county for which they have been elected, and extend these same methods to every county in the state, and even take away from the govenor and the secretary of the territory the power to perform the duties enjoined upon them. The supreme court of Pennsylavania and other states have held that this cannot be done.

The constitutional convention of Pennsylvania, assembled by virtue of authority of the legislature, by ordinance appointed five commissioners of election for the city of Philadelphia. An election law was then in force and applicable to that city. The supreme court of that state, in positive language, held, in the case of *Wells v. Bain,* 75 P. St. 39, that the convention could not prevent the regular election officers from holding their election. The court said:

"Now we come to the sixth section, which begins a different subject. 'The election to decide for or against the adoption of the new constitution, or specific amendments, *shall be conducted* as the *general elections* of this commonwealth are *now by law conducted.*' Thus the legislature said to the convention in these three sections—You shall have power to propose your work in three forms; you shall have power to determine the time and the manner in which these propositions shall be submitted; but the election by the citizens shall be conducted as the law itself directs as to general elections. The 6th section, as to how the election on the propositions submitted shall be conducted is mandatory, and is so for the best of reasons—it is the only legally authorized means of taking the sense of the people upon adoption of the amendments which can bind the whole people. In this way only can a majority of voters, who are not a majority of the people, bind them as the body politic or state. The legislature intended that the election should be conducted by known officers legally elected, and should be governed by a known system of laws with which the people are familiar, and thereby that they should both know and respect the authority under which the election should be held. No implication can be drawn from the word 'manner' to contradict the plain and positive enactment that the election shall be conducted according to the laws governing general elections. It would violate the plainest rules for the interpretation of statutes to make the merest inference stand higher than an intent expressed in distinct language. It is, therefore, clear to our minds that the ordinance relating to the election in the city of Philadelphia is flatly opposed to the act of 1872, and is thereby illegal and void. The prospective validation in the 32d section of the schedule only betrays the doubt the convention itself had of the validity of the ordinance in this respect."

Counsel, by law of argument, have referred to the conditions in the Indian Territory, and the necessity of recogniz-

ing the counties, as fixed and described in the constitution, for the purpose of holding elections there, and by reason of that condition and the conditions brought about on the Oklahoma side on account of the making of new counties, the right to recognize all counties as described in the constitution is claimed. The counties in the Indian Territory may be recognized, if at all, for the purpose of these elections merely. They are not yet counties, but districts for the holding of the elections. And even as to these counties I find that the election ordinance neither creates them counties or districts for the purposes of the election, but simply refers to them as the counties of ................, naming them. Indian Territory, however, is not situated like Oklahoma. The language of the enabling act is "The election laws now in force". That is, as they then existed, and not as they may be changed by the legislature of the territory, or as the counties may be cut up by the constitutional convention, but as they exist now, with all the legal officers provided in the statute, or their successor elected thereunder. The election laws "now in force" are to be used by the people of the territory to hold a territorial election to determine if they will adopt a constitution which has been prepared by a constitutional convention for a state to be composed of both Oklahoma and Indian Territory; and congress has said that these same laws "Now in force, as far as applicable" shall be extended to and put in force in the Indian Territory. This provision, for the purpose of elections, subjected the Indian Territory to the laws of Oklahoma, with the advantages and difficulties its provisions might grant or impose. And congress recognized these elections as elections under existing government, for has it provided that the

penal laws of the Territory of Oklahoma relating to elections and illegal voting, shall be put in force in the Indian Territory, and that the United States courts of the Indian Territory shall have the same power to enforce the laws *so adopted?* No; but the *laws of Oklahoma, extended to* and *put in force* in the Indian Territory as have the courts of the Territory of Oklahoma. If the laws are violated in holding these elections, is it a crime against the laws of the Territory of Oklahoma, or the future state? To the lawyer the question answers itself. Such crimes must be prosecuted under the election laws of the Territory of Oklahoma as they now exist, and the state courts, if they acquire jurisdiction of such crimes at all it will be by virtue of succession under the enabling act, as the laws of the future state cannot be broken before they are enacted and put in force. The convention cannot legislate regarding the election laws of Oklahoma any more than it can regarding criminal procedure for its courts. It certainly cannot divide the counties of Oklahoma, giving to the proposed counties present existence for any purpose which right at least a part of my brethren who have concurred in the majority opinion denied the legislature of the territory. The convention cannot justify its conduct in seeking to interfere with the present officers even on the ground of necessity, for it brought about whatever inharmony exists.

To justify the policy sought to be followed in Woods county regarding the county election officers, in excluding them from exercising their jurisdiction in that portion of the county from which Alfalfa and Major counties are proposed to be created for the future state, reason and justice must give away to desire; and, to hold the ordinance as valid,

in my opinion the law of the nation must be subordinated to the will of a temporary agency created by congress as a convenience in transforming a territorial to a state government. The convention has not only sought to limit the powers of these officers, but by the language used have imputed lack of confidence in their fidelity in the discharge of a future duty, by declaring that if they fail or refuse to perform any of the acts enjoined upon them by law, others should be appointed in their place. In certain instances they are to be made by the governor, and if he should fail or refuse to make such appointments, then they are to made by a member of their own body. The convention has no more power to appoint another to perform an official duty enjoined upon the governor by the territorial laws regarding elections, even though he refuses to discharge it, than they have to authorize another to approve the constitution and issue the proclamation should the President refuse or fail to do so. These different officers belong to different political parties, and are representatives of our best citizenship, and a residence of sixteen years in the Territory of Oklahoma has not brought to my attention an instance of an election officer refusing to perform any duty enjoined upon him as such, except when the duty to perform the act was uncertain, or in controversy, and he declined in order that a judicial determination might be had upon the conditions presented. Wherever any officer in Oklahoma fails to do his duty he may be removed from or compelled to perform it. But this power of removal, or power to compel performance of official acts, is independent of the convention, and not being the source of such power it cannot delegate the same to one of its members or anyone else.

And again, it is a well known fact that the ordinance as it now exists is not the ordinance as originally passed by the convention. It re-assembled and enacted a new ordinance. By upholding the present ordinance this court has necessarily recognized that the convention had a right to do so. This right having been approved by the court, if the convention desires, may it not re-assemble again and divide even all of the other counties of Oklahoma Territory, put into office those of its own selection, and remove those holding under the existing government, even though they have done no wrong or are willing to continue to discharge their official duties with faithfulness and integrity.

I was deeply impressed by counsel (As well as briefs) in the presentation of the theory, that the limitations in the enabling act upon the powers of the future state, once the state is admitted, will not be binding upon it, even though the convention has declared by ordinance irrevocable to accept the terms of this act of congress. Still I do not perceive that this doctrine has any bearing under the present conditions, in the adoption of a constitution, except that whatever terms congress has imposed I assume a declaration, at least, of intention to comply with them will be required. But whatever may be the intention regarding the policy of the future state, those things which are required as conditions precedent to admission, and the means by which they are to be effected, should conform substantially to the requirements of the enabling act.

The courts of the Territory of Oklahoma cannot have any thing to say about a constitution of the state, or as to what it shall contain, as its provisions affect the state government,

and do not apply to territorial conditions. It will create its own courts to interpret its own laws. But as congress (Having the power to admit states) has prescribed the procedure to be followed in bringing about the change from a territory to statehood, and all the laws applicable thereto are either laws of the United States or of the Territory of Oklahoma, the courts of the Territory of Oklahoma have the jurisdiction to determine if any of the persons or officers are exceeding their lawful powers, or interfering with the right of others. The convention itself is the creature of law, whose powers are fixed by law; and while the convention may make its own constitution, the courts have the power to require those whose duty it is to submit it to the people, and to conduct the election of the first officers for the state, to perform these duties as the law directs. And although it has been argued that no one can interfere in those matters except the President, and that he can only determine if the constitution and state government are republican in form, the enabling act itself imposes upon that high officer the further duty of determining as to whether or not the *provisions* of the enabling act have been complied with; and one of the requirements of the act of congress is that the election laws of Oklahoma, now in force, be respected and its provisions carried out in voting upon the constitution and in electing the officers for the state, through the election officers named in such election law, acting unmolested within their respective jurisdictions. And when these provisions are violated or in a way invade the rights of others. either private or official, and under circumstances which may even jeopardize the approval of the constitution itself, the courts should, on proper application, interfere. This authority

is vested in the courts for the safety and protection of the rights of citizens, and the protection of the public officers in the discharge of the duties enjoined upon them, whether those injuries have been inflicted or are threatened in the future, while the President, under the authority conferred, must wait until the elections have been held and the constitution finally submitted to him.

The laws should be so construed as to protect existing rights, and deny the advantage of present or threatened wrongs, for justice cannot always be subserved by denying the advantages of a wrongful act.

The plaintiff in this case, as commissioner of Woods county, under the law, has important duties to perform in connection with these elections. He has shown by his bill that the defendants threaten to and will interfere with him in the discharge of his duties. Under the record as I view the law, there being no controversy about the intention to do the acts complained of, I believe the plaintiff is entitled to an order enjoining the defendants (plaintiffs in error) from in any way interfering with him as a public officer in the discharge of those duties imposed upon him under the election laws of Oklahoma. I shall not prolong my discussion of this case by reviewing authorities showing that the court will enjoin an unlawful interference with a public officer in the discharge of the duties of his office. The appellee's right to relief, to the extent indicated, is clear, and the court should be quick to prevent the threatened wrong. Every one will concede that insubstantial irregularities in these elections should be overlooked. But the extreme advantages that might be taken under the decision of the court are so great, that the

present election officers may be removed at will and the positive act of congress continuing in force the laws of Oklahoma at the time of the passage of the enabling act, with immunity ignored. It is not sufficient to say that it will not be presumed that a public officer will abuse the authority conferred. The mere fact that he can, under powers granted, lawfully destroy the rights of others, should he choose to do so and no agency can interfere, is sufficient cause for alarm. The ordinance of the convention can no more restrict the jurisdiction of appellee in this case, in the exercise of his duties in the county of Woods, as now organized, to a small portion thereof, than it can effect the jurisdiction of the judge of the district court and compel him to recognize the counties of Alfalfa and Major in the administration of his office. The office of the judge was created by congress, and congress, by declaring that the election laws *in force* should control these elections, made the jurisdiction of the latter in the exercise of his duties regarding these elections, as sacred as the former in administering the laws.

My examination of the election ordinance has convinced me that the convention did not proceed upon the theory that any of the election officers, even in the counties that have not been divided, would act in these elections by virtue of their present offices, but that the ordinance named them as a matter of convenience, reserving the right to remove should they fail or refuse to act. No lawyer representing the appellants has asserted that the convention has such power. If the convention proceeded upon the presumption that it had the power to appoint all of these officers, then the greater the reason for the interpretation of the law for which I contend.

I do not contend that the courts have the authority to enjoin the convention from the performance of any act with reference to submitting to the people, propositions separately, or as a part of the constitution as a whole, or from passing any ordinance; but whenever the officers of the convention or others acting under authority claimed to have been conferred by such body. interfere or threaten to interfere with the officers of the Territory of Oklahoma in the discharge of official duties enjoined upon them by the enabling act in relation to the submission of such constitution to the people, that is in relation to the election, for its adoption or rejection, and the election of the first officers for the state, which are to be selected at the same election, the courts may sustain said wrongful acts and protect the territorial officers in the undisturbed discharge of said duties.

The defense that the interference complained of is too remote, is not urged, but on the contrary the parties to the action have requested a determination of the rights of the respective parties, under the facts stated in the petition, and I have considered the case with the view of settling the law applicable to the facts pleaded. The parties to the case have presented it as though the threatened interference complained of were imminent and I have given my views of the law accordingly.

I have refrained from expressing my opinion as to the course authorized to be pursued by the convention regarding the Osage Reservation. That reservation is not directly involved in this case. Nor have I attempted to discuss the powers of the convention pertaining to the Indian Territory. In that part of the proposed state, are courts clothed with

powers equal with those possessed by this court, and propriety forbids an unnecessary declaration of the law upon a state of facts which is not before this court in this case, and in which if any controversy should arise at all, it would most likely arise in the jurisdiction of the courts of the Indian Territory. My reference to these two sections of the proposed state have been such, and such only, as appeared to me necessary to make clear my position in the case before us.

The right of franchise is a most sacred right, and the law is universal that only those duly authorized can conduct elections. If my view of the law is correct, the most serious complications might arise by reason of the course that is being pursued, and the results of the election changed.

The court, in the present case, has not been slow to assert its own power and jurisdiction; and I believe that the right of the election officers of the organized counties of Oklahoma are equally as sacred; that they are threatened with an unlawful usurpation of their powers, and that the court should afford its protection.

But notwithstanding my own personal views as to the rights of the appellee, as herein expressed, a majority of my brethren have denied the plaintiff any relief. Their decision has become the rule and guide of conduct, and with a full realization of the wrongs that might be committed under the powers thus approved, but hoping that only good may flow from a wise and just exercise of the same, I accept it as the law, charged with the duty of respecting and enforcing it, as the only safety of the state and the nation is in full, free and complete submission to the law when by the proper authority so declared.

Dissenting Opinion by

IRWIN, J.: As I am unable to concur in the views expressed by a majority of the court, I think it is proper that I give some of my reasons for differing from the views expressed by my associates. The decision of this case turns entirely upon two legal propositions:

First: Did the constitutional convention have power and authority to divide Woods county?

Second: Is the election ordinance provided by that convention a valid and legal exercise of authority, and is the same binding upon the people of the two territories?

In determining the first of these propositions, it should be constantly borne in mind that there are recognized by our laws two distinct classes of constitutional conventions. The one. known and designated as revolutionary, that is, where the people meet in their sovereign capacity, and by themselves, or their representatives, form a constitution and government at the time existed. In such cases, the only limitation of the authority of such a convention would be those principles of natural justice and the rules of civil society which the wisdom of the past had dictated, and the general customs of mankind so long established as to become recognized as legal precedents. The other class is a constitutional convention which is called into being by a legislative enactment, by which enactment its authority is granted, and the limitations upon its acts fixed. Of such a class is the constitutional convention in this case. It owes it origin to the passage of the enabling act. It derives its authority solely from the act of congress defining its powers and providing for its creation. In determining the duties imposed, and the powers granted

to this convention, we must look to the precedents and the
judicial decisions applicable to the conventions of this class,
rather than to that of the revolutionary class, the latter not
being applicable to this class of conventions, and consequently,
of but very little assistance to us. This convention owes its
existence to the act of congress known as the enabling act.
This is its charter of authority to which we must look to de-
termine whether the convention has certain powers and au-
thority. The legislative intent of congress is clearly set forth
in the enabling act, and by that, the action of the constitu-
tional convention must be measured and circumscribed. The
people of these two territories were not meeting in their sover-
eign capacity for the purpose of forming a state government
where no government had heretofore existed, or to adopt a
constitution without the restrictions or limitations of any
superior or higher form of government, but rather they were
petitioning a government already established, for the privilege
of becoming a part of that government already organized. The
terms and conditions of our admission as a part of that gov-
ernment were not to be dictated by the people of these two
territories, but rather by the representatives in congress of
the people of the United States. The terms and conditions of
our admission were clearly set forth by congress in the enab-
ling act. The constitutional convention being the representa-
tive agents of the people of the Territory of Oklahoma, when
in convention assembled, were the creation of the enabling
act, and whenever any part of the constitutional conven-
tion is called in question, or their authority doubted, we must
look to the enabling act, and examine its terms and provi-
sions to determine the question of authority or power. In

order to clearly understand the scope of the legislative will, it is necessary to constantly bear in mind the object that congress had in view, and the condition with which the legislative enactment was to deal. The express provision of this enabling act was that the constitutional convention was authorized to form a constitution and state government for the new state. If the authority to divide Woods county is given in express terms any where in this enabling act, it must be in this provision. "To form à constitution and state government for the new state." Unless it can be found in this provision, then it does not exist in express terms, and we must look for it among the necessarily incidental powers conferred upon the constitutional convention by the enabling act, for in these two classes of power are expressed all the power and authority granted by congress to that convention. Any authority exercised by this convention must be found either in the express terms of the enabling act, or must be found in the necessity for their existence in order to carry out the power expressly given by congress to the constitutional convention. The constitutional convention was called upon by congress to perform a certain, specific, expressed mission. That was, to change the territorial form of government which had heretofore existed in these two territories, and form such government into a state government. They were called upon to change the form of government, not to change the map, unless such a change in the map became a necessary incident to the formation of a state government from these two territorial governments. At the time of the passage of this enabling act, county, township, school, municipal, city and village governments existed in a large portion of these two territories, had been here-

tofore created by an act of congress, and had been recognized by congress since the time of the adoption of the territorial form of government: As a necessary incident to such organized government, there were certain vested duties, rights and obligations attached. We do not believe it was the purpose of congress to unnecessarily overthrow this government and annul and set aside these vested rights, but rather it was the intention of congress that the change of government, if possible, should be accomplished without affecting or disturbing these vested rights. An act of the constitutional convention which can be classed as purely a legislative act must find its authority in the enabling act.   At best, the constitutional convention could only be classed as a very limited legislative body, limited with the prescribed boundaries provided by the enabling act. I hardly think it can be seriously contended that the language of the enabling act "To form a constitution and state government for the new state" would be broad enough to authorize an arbitrary wiping out and obliterating of county lines, and the cutting up and dividing of counties already established by the acts of congress. "To form a constitution and state government" would only mean to do such acts   as were necessary to accomplish this purpose, that is, they would be delegated authority to do such acts as were necessary to form a constitution and state government.   Now, unless it can be said that a state government could not be formed without the dividing of Woods county by the constitutional convention, then this provision, "To form a constitution and state government" would not confer upon the constitutional convention power to arbitrarily divide Woods county. It would hardly seem reasonable that the congress of

the United States would vest a subject of such vital importance to the particular localties affected, in the hands of a constitutional convention which was chosen for a particular purposes, and for a limited time; a body from whose action there was no appeal, and for an abuse of the discretion there was no remedy; a body over which neither the president, governor, nor anybody else had any particular vetoing power as to their action in dividing counties; and to allow that body to arbitrarily divide such counties as in its individual judgment might be deemed advisable, to submit that question to a vote of people who, being remote from, were not intimately or particularly interested in the subject, and put it beyond the power of the vitally interested persons to help themselves, when such an action was not absolutely necessary for the purpose of establishing or forming a state government. It can be readily seen that in the division of Woods county, the people most vitally interested would be the people of Woods county. And, note the manner of submitting this question of division to the people. It is submitted, as is proposed, at the same time the constitution of the state is submitted, and submitted to a vote of all the people, and even if every man, woman, or child in Woods county should register their vote against it, it would probably make no difference in the result. Thus all the interests of the people of Woods county, all their vested rights, duties and obligations as a county are set aside, changed and disposed of without their consent, and without any power to help themselves. This, it seems to me, was unnecessary, and was foreign to the purpose of congress.

In this connection it might be argued that it was expedient to divide Woods county, that the county was too large, and that the best interests of the people of the new state would be served by making two or three counties out of Woods, but it seems to me it can hardly be said that it is necessary in order to form a state government. It would hardly be said that a government could not be formed leaving Woods county as it was established by act of congress. The most that can be said is that it would be more expedient in forming a state government, to divide Woods county. But, it would seem that even with this view of the case, it would seem reasonable for congress to leave that to the legislature of the new state when organized under the restrictions, limitations and checks provided by law, and that the question of the division of Woods county would more properly and justly be submitted by the legislature of the state of Oklahoma, to the citizens, residents and tax-payers of Woods county, than to make the rights and interests of Woods county depend upon the vote of the people of the eastern part of the Indian Territory, a people who have no intimate personal interest in that question. Another very strong reason why I think that congress did not intend that the constitutional convention should unnecessarily disturb county boundaries, or change the lines of counties already established, is that I find in section 21 of the enabling act, that congress expressly provides that the Osage Indian Reservation shall constitute a separate county, and provides that the constitutional convention shall so provide by ordinance. Section 21, provides that "The constitutional convention may by ordinance provide * * * * and shall constitute the Osage Indian Reservation a separate

county, and provide that it shall remain a separate county until the lands in the Osage Indian Reservation are allotted in severalty, and until changed by the legislature of the state of Oklahoma." Now if the contention of the majority of the court is sound, and it was the express intention of the congress of the United States that the constitutional convention should have power to divide and organize counties at will, to establish county lines and county boundaries where ever they saw fit, and that this authority was given in express terms by the language used in the enabling act, "To form and constitute a state government for the new state" then why should congress in this section 21, of the enabling act, make express provision that the constitutional convention should have power to make and organize the Osage Indian Reservation into a separate county? It does not seem that congress would do a useless thing or use useless language, or language that did not mean anything. What possible meaning could the language used in section 21 of the enabling act, authorizing the constitutional convention to make the Osage Indian Reservation a separate county have, providing the enabling act in the language, "To form a constitution and state government for the new state" granted and conferred the power to the convention to change lines and county boundaries whenever they saw fit? If they had that general power, would it not extend with equal force to the Osage Indian Reservation as well as to any other part of Oklahoma? I cannot conceive any reasonable purpose that the congress of the United States would have for using the language used in section 21, of the enabling act, providing the granting of power to change and locate county lines is as contended for by the

majority of the court; but rather I think it argues that the congress of the United States never intended that county lines should be changed, county boundaries established, or counties organized, except where such establihsing and organization of counties and changing the county lines were necessary in order to form a state government for the new state. It is not necessary that in this opinion I express any judgment as to whether in the unorganized part of the Indian Territory the constitutional convention had or had not power to organize the counties. For the purpose of this opinion, it might be conceded that they had that power, because the organization of counties out of unorganized territory was necessary in order to make a complete state government, but it certainly seems that where the county lines are already established, the county in existence, the county officers in the discharge of their duty, and all the machinery of the county government in force and in active operation, that no absolute necessity can exist for the changing of these county lines, or the cutting up of these counties into separate counties in order to form a state government, and unless it can be said that a state constitution could not be formed, and a state government could not be organized without the dividing of Woods county, then there is no express authority contained in the enabling act authorizing such action on the part of the constitutional convention.

It might be contended that the provisions of section 21 of the enabling act authorizing the convention to constitute the Osage Indian Reservation one county, and preserving the same as such until all lands have been allotted, and until changed by the legislature, is recognizing the right of the

convention to recognize counties, but it should at the same time be remembered that the Osage Indian Reservation is unorganized territory, and is attached to another county for judicial purpose. It has no existence as a county, and depends for its power to discharge its functions as a county upon its being attached to another county. No rights are vested, and no obligations are incurred by reason of the establishment of county boundaries therein, and it might reasonably be argued that as a county is a necessary component part of a state, and as no county here existed, it was necessary to form a county in order to form a state government, but this argument would not apply to Woods county, where the county was already formed and in existence. If the power to divide Woods county is given by express terms in the enabling act, then it applies to all parts of the two territories, organized as well as unorganized territory; and when this is once conceded, there is no limitation to the exercise of the power, and the matter is left entirely to the will of the convention. If the power exists, it is an unqualified, unlimited power, and only circumscribed by the constitution of the United States. Congress reserved to itself no power or authority over the acts of the convention, except that it requires that the constitution when formed and adopted shall be submitted to the President, and the only power or authority he has in the premises is to determine first, that it is republican in form, and second that it is not repugnant to the constitution of the United States and the principles of the Declaration of Independence. The constitution might be so worded and so formed as to comply with all these requirements, regardless of whether Woods county was left as one, or divided

into many. And, under the provisions of the enabling act, it would not be the duty of the president to inquire into the power of the constitutional convention in dividing or refusing to divide counties.    His only duty would be to see to it that it complies with the constitution of the United States and the Declaration of Independence, and being republican in form, would meet the requirements of the enabling act. Remember, that in this case, the sole contention is not that the constitutional convention have not complied with the terms of the enabling act, but that they have done more, have gone beyond the terms of the enabling act, and done things unauthorized by the act. And, if this contention can be maintained, there is no doubt as to the duty of the court to restrain such action.    But, if the courts do not act, then there is no power of restraint upon this convention given. If it is true, as contended for in the majority opinion, that this convention has unlimited power to divide at will the counties established and in operation in Oklahoma Territory and that with the exercise of this power the courts have no jurisdiction to interfere, suppose that if any reason, political expediency, or for any other reason, the constitutional convention should conceive the idea that Oklahoma county or Logan county should be changed or divided, and suppose they should ordain that a line should be drawn defining the boundaries of Oklahoma county so that Oklahoma City should be placed one-half in Cleveland county and leaving the other half in Oklahoma county, and so as to put one-half of the Capital City of Guthrie in Kingfisher county, and the other half in Oklahoma county, and thus entirely obliterate from the map of the county of Logan, would it be contended

by any one that this was an exercise of authority legally vested in the constitutional convention by the words of the enabling act "To form a state constitution and state government for the new state"? It might be said that this is a very extreme case, and one which would not be likely to occur. Concede this, is it not one which is within the power vested within the constitutional convention by the enabling act, if the construction of the majority opinion of this court is a correct statement of the law? Is there any different rule that would apply to Logan county, or to any other organized county in this territory, than that which would apply to Day county, and is this not what has been done by the constitional convention in this case of Day county. It seems to me this would be an exercise of authority more arbitrary than has ever been recognized in any body since the organization of this county, a power greater than that possessed by congress themselves, and a power which the Czar of Russia in his palmiest days would never have arrogated to himself, and one which in my judgment the congress of the United States never intended to be vested in any man or set of men. Now the writer of this opinion might subject himself to the criticsm of being called an extremist, but is it not within the power vested in the constitutional convention by the enabling act as construed by this court? The illustration used is used only for the purpose of showing the extremes to which the doctrine laid down by this court in the majority opinion might be carried. But, it may be argued that an exercise of authority arbitrary as this, and such a division so manifestly unjust would not be approved by the people of these two territories when submitted to them, but in this connection

it should be borne in mind that this proposition of the division of counties is to be submitted with and as an integral part of the constitution itself. No provision is made whereby a vote can be taken upon the proposition separate from that on the constitution, but before the people could express their disapproval of such a county division, they would be driven to the necessity of voting against the constitution, and defeat the very purpose for which this constitutional convention was organized. There is no way pointed out by which this county division, however absurd it may seem to be, or how unjust it may be, can be defeated at the polls without defeating the constitution itself.    And, if the opinion of this court is correct, that this court has no power to restrain the constitutional convention in the exercise of authority in dividing counties, and the enabling act only places it within the power of the President to determine whether the constituion as formed is republican in form, and not repugnant to the constitution of the United States and the principles of the Declaration of Independence, where would there be any relief against such arbitrary action on the part of the constitutional convention? It has never been the policy of our law to vest arbitrary power in any body without surrounding and safeguarding it by limitations and checks. No legislature has ever been authorized to act without a veto power, or some check or restraint being placed on them by the act of their creation.    But, under the view taken of the power of this constitutional convention, here is the only body known to the law that has unlimited, unqualified and unquestionable power —a creature greater than its creator, a stream higher than its source and a power which recognizes no rights and no

Frantz *et al.* v. Autry.

authority save and except its own sovereign will, and that body authorized to formulate fundamental principles, establish government and make laws for a million and a half of the most enlightened, and intelligent people on the earth. It seems to me the courts should proceed with great caution and hesitation before announcing a doctrine so far reaching in its effects, and so sweeping in its results.

But it is argued by counsel for plaintiff in error that the division of counties, and the location of the county lines complained of is not permanent, but are only propositions to be submitted to the people for their ratification, and that therefore, no great harm can be done, no rights endangered and no hardships suffered by any one, because the will of the people when expressed at the ballot box is a sufficient safeguard to protect the rights of all. This is no doubt true as a general proposition, and the writer of this opinion has no doubt that the honest expression of the people of these two territories would be a sufficient safeguard to protect the rights of all if this matter could be submitted to them in such a way as to get their honest judgment. But, we must bear in mind the manner in which the action of the constitutional convention in dividing organized counties is to be submitted to the people of the state of Oklahoma for their ratification or rejection. It is not submitted in the same manner that the question of prohibition is submitted, as a separate proposition, to be voted on independently by the people, but it is incorporated in and becomes an integral part of the constitution itself, and is only submitted to the people for their approval or rejection as a part of the constitution. Every voter who votes upon this question is compelled to either express his

approval of the action of the convention in dividing the or-agnized counties, or vote against the constitution.   There is no way provided whereby any elector can express his honest sentiments on the question of dividing or not dividing these counties without sacrificing his right to express his preference for the constitution.   Would any person insist that where a matter of his own personal rights was involved, that the sub-mitting of the question to the people for their approval in this manner would be an honest way of getting the fair, un-biased, unprejudiced expression of the people on the question? By this manner of submission, every man who desires state government, and who desires that this county have the bene-fit of statehood, must vote for the ratification and approval of the acts of the convention in dividing these counties, or he must lose his vote in favor of statehood.   No matter what his convictions may be as to the right or wrong of this county division, and no matter what his sense of justice may be, if he desires to vote for statehood he must at the same time express his approval of the action of the constitutional con-vention in dividing these counties, whether such action meets his approval or not, and I submit that this manner of sub-mitting the question is not one likely to secure a fair, un-biased and unprejudiced expression of the people on the question. It is submitting the question of the division of coun-ties and the establishing of county lines to a people who from their remote residence from the divided counties have not the vital personal interest that the immediate residents of the county have, and at the same time that the question is submitted to them, it is submitted to them under duress, because they are compelled to vote in a certain way on the

question, or lose the boon of statehood.    When we view it in this light, it certainly can have but little weight in determining the legislative intent as to this subject, as under such submission the opponent of the county division would stand about as much show as the proverbial snowball in Hades, or a Republican candidate for office in the state of Texas.

Another reason suggests itself to the mind of the writer of this opinion why the congress of the United States did not intend by the enabling act to grant the power, either directly, or by necessary implication, to the constitutional convention to divide counties,  or  change boundaries or county lines in counties already established in the Territory of Oklahoma, is, that by section 6, of the enabling act, it is provided: "That until the next general census, or until otherise provided by law, the said state of Oklahoma shall be entitled to five representatives in the House of Representatives of the United States, to be elected from the following described districts, the boundaries of which shall remain the same until the next general census * * *." Then follows the enumeration of the different counties and recording districts in the Indian Territory which shall respectively constitute the different congressional districts.    Now it seems that the provision that the limits and boundaries of the congressional districts thus established by congress shall not be changed until the next general census, makes the legislative intent perfectly clear that congress did not intend that any legislation should be had or any authority exercised by the constitutional convention which should in any way change the boundaries of these congressional districts. If it can be shown that the proposed county division now under consideration does have the effect of changing the boun-

daries of any of the congressional districts thus established by congress, I think it will be established beyond controversy that such division of counties was not within the legislative intent of congress.   Section 6 provides, that District No. Two shall comprise the counties of Oklahoma, Canadian, Blaine, Caddo, Custer, Day, Dewey, Woodward, Woods, and Beaver. Now, it is fair to presume that in making this distribution of counties into congressional districts, congress intended that the boundaries should be in accordance with the counties as then  existing,  and the boundaries  of counties as then established. By the division of counties proposed by the constitutional convention, one tier of townships on the east side of the southern portion of Caddo county is taken off from Caddo county, and made a part of Grady county. Grady county before the division of the counties, was a part of the Chickasaw Nation, known as Recording District No. 19, and as such in the enabling act, formed a part of the 5th congressional district.   Now, the effect of this division would be to change the boundary line of the second congressional district, as established by congress, and place the boundary line where the same touches Caddo county, one tier of townships to the west, and would move the boundary line of the 5th congressional district, where the same intersects Caddo county, on the west line of the 19th recording district of the Chickasaw Nation, one tier of townships to the west, thus changing the boundary lines of both the second and fifth congressional districts to this extent. By the enabling act District No. 5 shall comprise the counties of Greer, Roger Mills, Kiowa, Washita, Comanche, Cleveland, and Pottawatomie, and the territory comprising recording districts numbered seventeen, eighteen,

nineteen, and twenty, in the Chickasaw Nation, Indian Territory. By the terms of the enabling act, Day county is a part of the second congressional district, and Roger Mills county forms a part of the fifth congressional district. By the division and readjustment of counties proposed by the constitutional convention, Day county is entirely obliterated from the map of Oklahoma. The southern portion of Day county is attached to Roger Mills, and the balance of the county, or the northern portion, is made into Ellis county. By the apportionment made by congress fixing the boundaries of the fifth congressional district, the north line of that district where the same borders on Roger Mills county, would be on the line of Roger Mills county as it existed at the time of the passage of the enabling act, and before the division of the counties. After the division of counties, a portion of Day county was placed into and became a part of Roger Mills county, thus taking a portion of Day county, to-wit: The southern part of Day county which was originally in the second congressional district, and placing it in the fifth congressional district as a part of Roger Mills county, thus materially changing the northern boundary of the 5th congressional district, and the southern boundary of the 2nd congressional district, where the same intersects Day and Roger Mills counties, and moving the same farther north thus taking a portion of Day county out of the second district and placing it in the fifth, therefore necessarily making the line of the second and fifth districts at a different place than where it was located by the act of congress. A tracing out of the changes made by the division of counties as proposed by the constitutional convention, will show that in

many other instances the boundary lines of the congressional districts as established by congress must of necessity be changed.

There is only one theory on which this re-adjustment of counties can be considered which will avoid the conclusion that the re-adjustment would change the boundaries of the congressional districts, and that is, if the readjustment of counties and the placing of additional territory in one county and taking it from another county in another congressional district might not change the congressional district, so far as the added territory was concerned. That is, the territory so added and so subtracted might be attached to the county and made a part of the county for all purposes except congressional, and it might be argued that although it is a part of another county, it still remains a part of the same congressional district, and that the boundary lines of the congressional districts would not be changed. But this solution of the problem would lead to very serious political complications as it would require not only a special ballot box for this territory so added, but it would also require a special ballot and a separate count of the ballots by the election commissioners, as under the system of voting generally in use throughout the United States in preparing the ballot, all of the names of the candidates, national, congressional, state and county, are placed upon one ballot, and are distributed by the county clerks of the various counties to the different election precincts in the county. In this added territory, as for instance, in Grady county, if the election officers of the election precincts in this added territory should apply to the county clerk of Grady county for the ballots to be used in a general

election, the ballots would not contain the correct names of the candidates for congress, but would contain the correct names of the candidates for the other offices, state and county. If application should be made for these ballots by the election officers of this added territory to the county clerk of Caddo county, then it would contain the correct names of the candidates for congress, but would not contain the correct names of the county officers, and it would also seem that the returns for congressmen would have to be made by the election officers in this added territory in Grady county to the election commissioners in Caddo county, and the returns on the election of the other officers would have to be made to the proper officers in Grady county. This would present the embarrassing predicament of having the electors of this added territory voting for state and county officers in Grady county, and voting for members of congress in Caddo county. It will be readily seen that this would lead to endless confusion, and would make many unfortunate and embarrassing complications, and it would hardly seem that the congress of the United States intended to so form the enabling act and so grant authority under it as to lead to this result. We have the right to presume that congress legislated on this subject with a full knowledge of the conditions, and that they made the enabling act with a full understanding and appreciation of all the results that might necessarily flow from it. The purpose of citing this illustration is not to show the fact that it is impossible to harmonize the conditions, but for the purpose of showing the improbability of congress intending any such result, and to show the probable legislative intent of congress in the matter.

Now, I have ·given this subject careful consideration, much study and much thought, and I am unable to arrive at any other different conclusion than that the re-division and re-adjustment of counties and boundary lines as proposed by the constitutional convention must, of necessity, if acted upon by the people, and recognized as a law, change the boundaries of the Fifth congressional district established by congress, and must be an express violation of the express direction of congress, which in plain terms indicated the legislative intent that the boundaries shall remain the same until the next general census. This being true, I cannot believe that it was ever the intention of congress to put into the enabling act an express prohibition against the changing of the lines of the congressional districts established by congress, and then, by the same document, put into the hands of the constitutional convention the unlimited power to do a thing which would directly contradict that express prohibition. Hence, I am forced to the conclusion that congress never intended to give the constitutional convention this power. If my conclusions upon this proposition are correct, then in my judgment, it entirely disposes of the other proposition, that is, that the constitutional convention had no right by its election ordinance to appoint county officers in the new counties, and clothe them with authority to act as such. My conclusions are that a constitutional convention, such as the one under consideration has only such powers as are expressly granted to it by the act of congress known as the enabling act, and such powers as are necessary to carry into effect the powers expressly granted to it by congress; that neither under the express powers granted, or the implied powers incident there-

to, has the convention any power or authority to determine the boundaries of existing organized counties in the Territory of Oklahoma, or to divide such counties, or to create new counties, and particularly, they have not the lawful authority to divide Woods county; and by both express and implied limitations under the law, power and authority was withheld from the convention to interfere in any manner with the existing organized counties in the Territory of Oklahoma. That a constitutional convention created and convened under the enabling act is composed of delegates who are simply agents appointed by the electors to propose a constitution and state government for the proposed state, and the enabling act is the warrant of attorney under which the convention is authorized to act. And all matters beyond the scope of the agency as limited by such warrant of attorney, are *ultra vires.* That this constitutional convention has no power or authority to create or appoint any officer or officers for any county, township, municipality, or precinct in any part or portion of the organized county of Woods, to take effect prior to the ratification of the proposed constitution by the electors, and the issuing of the proclamation by the President, and it has no power or authority to create any county, township, municipality, or precinct, or to interfere with or displace any officer or officers for such townships, municipalities, or precincts in the organized county of Woods, or any part of it, in the exercise of their lawful and legitimate duties as such officers in it, or until the expiration of the term of the existing officers now exercising the duties of the same in Woods county. I take it that the division of counties and the location of boundary lines of counties, as well as the estab-

lishing of county seats in counties, comes within the pur-
view of what is known as ordinary legislation, and that be-
fore the constitutional convention can indulge in any such
legislation they must be able to show a warrant of au-
thority in the enabling act which called them into existence.
That if they cannot find the authority for such legislation
in the express terms of the enabling act, or in the necessarily
implied powers conferred upon them by the enabling act,
then they do not possess such powers. That they are not the
representatives of the people in the sense that they ex-
ercise in any degree the sovereignty of the people. That they
are not a revolutionary convention, but they are a conven-
tion called into existence, organized, regulated and limited
by legislative enactment, and are bound by the terms of the
enabling act, which is the only charter of their authority. Mr.
Jameson, in his excellent work on constitutional conventions,
in section 371, uses this language:

"* * * On the other hand, no fact is better established
than that, beyond the province thus specially set apart for
them, neither conventions, nor the bodies of - electors have
any legislative power. They can neither of them pass any
law comprised within the sphere of ordinary legislation."

In the foot-note to the same section, the author remarks:

"The debates of our conventions are full of disavowals
of a right on the part of those bodies to pass ordinary laws;
in a few cases, however, it must be admitted that right has
been claimed as a part of a general claim of all sovereign
powers. It has never been practically asserted, however, ex-
cept in a few doubtful cases, which will be considered here-
after."

In section 421 the same author says:

"\* \* \* The reasoning of those who assert for the convention a general power of legislation is, in its last analysis, that by which is vindicated the doctrine of convention sovereignty, of which in its general form, a refutation has already been attempted."

In *Ex Parte Birmingham & A. R. Co.* (Ala.) 42 So. page 120, quoting from *Woods Appeal,* 75 Pa. St. 59, it is said:

"A convention has no inherent rights. It exercises powers only. Delegated power defines itself. To be delegated, it must come in some adopted manner to convey it by some defined means. This adopted manner, therefore, becomes the measure of the power conferred. The right of the people is absolute in the language of the bill of rights, 'To alter, reform, or abolish their government in such a manner as they may think proper.' "

And, on the following page, 121, quoting from the same case:

"The legislature may not confer powers by law inconsistent with the rights, safety and liberties of the people, because no consent to do this can be implied; but they may pass limitations in favor of the essential rights of the people. If the authority of the people passes to the convention outside of the law, the people are left without the means of self protection, except by revolution. Then the singular spectacle is presented of the absolute sovereignty of the people being vested in a body of agents without any known means of transmission or limitation." ,

And on page 122, citing from *McDaniel's Case,* 2 Hill, Law, 270:

"An ordinance is produced to us passed by a certain number of individuals assembled in Columbia. This gives it no authority as an act of the people. But we are told they

were elected by the people. This, however, is not enough. To what purpose were they elected by the people? To represent their sovereignty. But was it to represent their sovereignty to every purpose, or was it for some specific purpose? To this no other answer can be given than the act of the legislature under which the convention was assembled. Certainly the people may, if they will, elect delegates for a particular purpose, without conferring on them all their authority.

"The supreme court judge of Massachusetts, in 6 Cush, 574, 575, in discussing this question said. 'Upon the first question, considering that the constitution has vested no authority in the legislature in its ordinary action to provide by law for submitting to the people the expediency of calling a convention of delegates for the purpose of revising or altering the constitution of the commonwealth, it is difficult to give an opinion upon the question, what would be the powers of a convention, if called? If, however, the people should, by the terms of their vote, decide to call a convention of delegates to consider the expediency of altering the constitution in some particular part thereof, we are of the opinion that such delegates would derive their whole authority and commission from such vote; and upon the general principles governing the delegation of power and authority they would have no right, under such vote, to act upon any proposed amendments in other parts of the constitution not so specified."

And, on page 122, quoting from *Bragg v. Tuffts,* 49 Ark. 560, 561, 6 S. W. 160, it is said:

"The first question that suggests itself, is, what right had the convention—a body consisting of but a single chamber —to enter upon the domain of general legislation? For the raising of revenue, the providing of ways and means to meet the expenses of administering the government, and the pre-

scribing of the funds in which taxes are to be paid, are legis-
lative functions, not of a fundamental character. By the
constitution of 1836, and all other constitutions that have
ever been in force in this state, the legislative power has been
confined to a general assembly, consisting of a senate and
house of representatives. The governor also has always had a
voice in legislation, a limited power in vetoing measures which
did not meet his approval. Now a convention called, for in-
stance, to frame a new constitution, has no inherent right to
legislate about matters of detail. All the powers that it pos-
esses are such as have been delegated to it, either by express
grant or necessary implication. But we are of the opinion
that when a convention is called to frame a constitution
which is to be submitted to a popular vote for adoption, it
cannot pass ordinances and give them validity without sub-
mitting them to the people for ratification as a part of the
constitution. The delegates to such a convention are but agents
of the people, and are restricted to the exercise of the powers
conferred upon them by the law which authorizes their elec-
tion and assemblage."

And, in the same case, (*Ex. Parte Bir. & A. R. Co.,
supra*) it is said:

"The act so clearly defined the purpose for which the
convention should be held that we have every reason to con-
clude that the legislature did not, for a moment, anticipate
that the convention would undertake to indulge in local leg-
islation relating to Shelby and St. Clair counties."

In Jameson on Const. Con. section 420, is this language:

"Does an analogous rule prevail in relation to the con-
vention, the framer of the fundamental law? Or, may it, by
virtue of some transcendent power. inherent in it, or of well-
established custom or precedent, overleap all bounds inter-
posed to limit its competence and take upon itself the func-
tion of legislation in general?"

And, in section 421:

"This question will be examined upon both of the grounds indicated in their order, namely, first, upon that of inherent power, and secondly, upon that of custom or precedent.

"First, the reasoning of those who assert for the convention a general power of legislation, is, in its last analysis, that by which it vindicated the doctrine of conventional sovereignty, of which, in its general form, a refutation has already been attempted. The particular argument in this connection is, that the business of a convention is extraordinary, beyond the competence of either of the recognized ordinary agencies, of the sovereign; that that body receives its commission from the same source as do these agencies, and, therefore, on the whole, is entitled to outrank them all; that, although as a prudent precaution against dissatisfaction or cavil, it is doubtless better for a convention to forego the exercise of extreme rights and submit its works to the judgment of the people, yet it is not true that it lacks power directly and definitively to enact the supreme law of the land; that, if this be conceded, it needs only to analyze the general power thus described into its constituents to find the power in question; that the fundamental conception of the business of a convention is, that it takes to pieces, or as it is some times expressed, tramples under its feet, the existing constitution of a state, and out of the old materials, or out of old and new together, erects a structure to fill its place; that, with the constitution, falls of course the government of the state; that, starting; thus, potentially at least, according to its own will, with a clean slate, to deny to the body possessing such omnipotence the power of legislation, would be to deny that the greater includes the less; that, if it can enact the fundamental law, why not, also the ordinary statute law, of which the nature, it is true, is somewhat dissimilar, but whose importance is vastly inferior?    That a convention is

competent, by constitutional provision to abolish all existing agencies of government, and to fill their places with others constructed on different principles. Is it then conceivable it is asked, that it cannot do directly, what it can do indirectly, or that the right to exercise so exalted a prerogative is conditioned upon its exercise in a particular mode? That as a matter of fact, the convention through its relation to the several departments of the government, as in turn their destroyer and their creator, can exercise at will, the functions of each of them; that, being a virtual assemblage of the people, it wields all the powers which the people themselves would possess, were it in the nature of things possible for them to act directly, hence, that within the bounds fixed by its own discretion, a convention may make laws or may interpret or execute them."

And, in section 422, the same author says:

"To this argument, the following considerations constitute in my judgment, a complete answer:

"If the safety of the people is the supreme law, of which there is no doubt, and which I affirm, the maxim involves both a grant of power and a limitation of power. It is a grant of power, inasmuch as it authorizes and requires all public functionaries to protect and defend the people at whatever cost; to do it, however, by adhering, first to the letter, and secondly, to the spirit of their instructions, that is, of the constitution and laws; and thirdly, to the principles on which the social edifice is bottomed. When the letter of the law is silent, or its spirit doubtful, the principles indicated are the only chart by which official conduct can be regulated, and are the first in validity and sacredness, since they are the sum of the letter and spirit of positive law, as well as that unwritten law which presided at the genisis of the social state, anterior to all positive law. Hence, it is plainly the duty of such functionaries always to conform to those principles, since a disregard of them involves, in substance a

violation of the letter and spirit of the positive law, and at. length the ruin of the commonwealth. Do what necessity requires, and ask for indemnity for technical breaches of law, is the rule of practical conduct dictated by the maxim under consideration."

Citing *Rive v. Foster*, 4 Harrington's R. 479.

"As a limitation of powers, the same maxim is of extensive application. In cases of doubtful construction of constitutional provisions, or in which there are no express provisions determining grants of power, it is the most important touchstone in our whole system. Starting with the postulate of representative republican institutions, the two following propositions must be accepted—First, that whatever manifestly endangers the safety of these institutions must be forborne, though authorized by an express grant of power; and secondly, that no act whatever must be done or tolerated in the absence of such a grant, of which the tendency or still more the direct effect would be to endanger them. In the case last supposed, no power to do the act could be implied, under any circumstances whatever, no matter how clearly it might seem, for the time, to be expedient.

"Sec. 423: Now in the light of these principles, is the exercise by a convention of legislative or other governmental powers, in addition to those clearly belonging to it, to be considered as within its competence, as a constitutional body? Is such an assumption of power one which threatens no danger to the commonwealth? By the theory of those who accord to it such powers, as soon as the convention is assembled, the control of the existing government is at an end; the constitution lies torn into fragments under its feet; and while the work of restoration is in progress, that body alone constitutes the state, gathering into its single hands the reins ordinarily held by the four great systems of agencies constituting the government to whose functions it succeeds. If this be so, what, but its own sense of justice

is to restrain such a body from running riot as did the Thirty Tyrants at Athens? The jurists of the Illinois convention, of 1862, as we have seen, affirmed that the act under which such a body assembles is no longer binding, when once it has become organized. If, at that moment, it has also cast upon it, by virtue of its great commission, all governmental powers, how easy to extend the scope and the period of the exercise of those powers under the plea that expediency demands it. The expedient is the appropriate domain of a legislature. If at the moment of organization, a convention is endowed with legislative powers, it may be deemed expedient to subvert the system of guarantee by which our liberties are assured to us, and at the same time to withhold from the popular vote the constitutional provisions by which the change is to be effected. Such a consummation would be not merely possible, it would be probable. And clearly, the possibility of its occurring with an appearance of rightfulness is enough to stamp as dangerous that theory of conventional powers from which it must flow. In the science of politics, it is an important point gained to have settled the limit where normal action ends and revolution begins. To have done that, is practically, in most cases to have rendered revolution impossible.

"The result is that a convention cannot assume legislative powers. The safety of the people, which is the supreme law, forbids it. Even if we suppose the body expressly empowered by the legislature to exercise such powers, the right so to do must be denied, because the same supreme law places an absolute interdict on such a grant. It is beyond the power of a legislature to delegate any such authority.

"Sec. 424: To these general considerations, tending to discredit  the claim of conventions to legislative powers, must be added the decisive circumstance that our constitutions, as well state as federal, have vested all the power of ordinary legislation the people have chosen to grant at all,

in our legislatures. The construction put upon these provisions of our constitution by the courts is, that the grant is exclusive, and that the power can neither be delegated by the legislatures, nor exercised by the people, not even by the whole people.

"Sec. 425: Were additional arguments needed to demonstrate that a convention has no power of ordinary legislation, reference might be made to the fact, that the possession of such a power would be extremely inconvenient, on account of the necessarily temporary and experimental character of such legislation on the one hand, and the difficulty of effecting changes in the enactments of conventions on the other. Every ordinance or constitutional provision passed by a convention, assumes a form nearly as rigid as that of the Median laws; they can be repealed only in the formal way in which they were enacted. It would be impossible to administer with any success any government so crippled in its legislative arm. The result would inevitably be, that laws would be constantly disregarded, or that conventions would become so necessary and frequent that they would ultimately supplant our legislatures."

I have not indulged in as extensive a citation of authorities as the subject under discussion would warrant for the reason that in my judgment, the conclusions reached are logical deductions which can be drawn from the enabling act itself, when we interpret the same in the light of all the surroundings and conditions which existed at the time the same was passed, bearing in mind the object to be attained, and the result to be accomplished. This is a question of very grave importance to the people of these two territories, One which is important, not only in the present, but of vast importance to the future. It is one which reaches the vital interests of the state to be formed from the virgin soil of

45—Vol. 18

Frantz *et al.* v. Autry.

these great territories. It is one, the importance of which should raise it above personal or partisan feeling; one in the discussion of which, party politics and personal interests should have no place, and no weight; one in which the people require at the hands of the courts their honest, unbiased judgment, uninfluenced and unhampered by anything other than a careful, and candid consideration of the law as it exists, and an honest expression of opinion, and it is only the vast importance of the subject which induced me to file this dissenting opinion. I have briefly given my views of the subject as they occur to me, that they may be made matters of record showing my reasons, or some of my reasons, for differing with the conclusion reached by a majority of this court. And, while I entertain the highest regard for the attainments and legal ability of the members of this court, and have the greatest respect for their legal opinions, I am constrained to dissent from the views expressed by them in this case.